In the

# United States Court of Appeals

## For the Seventh Circuit

───────────────

No. 20-3256

ANTONIO D. SHANNON,

*Petitioner-Appellant,*

*v.*

RANDALL HEPP,

*Respondent-Appellee.*

───────────────

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:15-cv-00604-WCG — **William C. Griesbach**, *Judge.*

───────────────

ARGUED SEPTEMBER 13, 2021 — DECIDED MARCH 4, 2022

───────────────

Before RIPPLE, ROVNER, and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* A Wisconsin jury found Antonio D. Shannon and his brother Terry Shannon guilty of one count of first-degree homicide and a related firearms charge. The presiding judge ordered Antonio to serve a prison term of life plus five years, without the possibility of release for extended supervision. The Wisconsin courts affirmed Antonio's conviction and denied his postconviction claims for relief.

Antonio then turned to federal court, seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Antonio alleged that his trial counsel was ineffective in failing to adequately investigate his claim of self-defense, in advising him not to testify in support of that defense, and in neglecting to prepare him to testify, and that his appellate counsel was likewise ineffective in failing to pursue the ineffective assistance claim on direct appeal of his conviction. The district court denied Antonio's petition, concluding that the Wisconsin Court of Appeals' decision rejecting these claims was not an unreasonable application of the U.S. Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). We affirm.

## I.

In the early hours of May 7, 2006, Terry Shannon had an argument with Bennie Smith at an IHOP restaurant in Racine, Wisconsin. The two men had links to rival gangs and there evidently was bad blood between them: in the preceding weeks, there had been at least two incidents in which Smith and his cousin Courtney Taylor had fired shots at Terry.[1] Antonio would later testify at a post-conviction hearing that he had been trying to ascertain what the nature of the dispute was between his brother, Smith, and Taylor and how it could be resolved peacefully.

---

[1] One of the two shooting incidents left a bullet hole in the headrest of the car Terry was driving, and the second resulted in damage to the car's side-view mirror. Antonio would later recall hearing rumors of a third shooting incident. He and the mother of his child, Tiffany Gray, would also describe a fourth incident in which Gray noticed two men loitering on the sidewalk opposite his house. When she told Antonio about the men, he stepped outside and told them to leave. He got into his vehicle to pursue the men and saw Taylor's truck passing nearby. He later told Gray that the incident

Taylor, Calvin Miller, and Kinte Scott were with Smith at the IHOP on May 7. Scott and Taylor would later testify that, during the argument between Smith and Terry, Terry was making gestures suggesting that he was armed. By their account, Smith challenged Terry to a fight: "[W]hy don't you be a man and put your gun down and … we get rid of all this past drama, whatever." R. 25-10 at 178. Terry declined the challenge, and Smith, Taylor, Miller, and Scott left the restaurant.

The four men drove to Taylor's apartment on College Avenue and parked on the street in front of the building. They had previously arranged to meet two women there whom they had encountered earlier in the evening. The women arrived in their own car and parked across the street. Smith, who was in the driver's seat, rolled down his window and he and his companions began talking and flirting with the women.

Shortly before 3:30 a.m., roughly an hour after the argument at the IHOP, Terry and Antonio drove up to the scene on College Avenue and pulled along side of Smith's car. Antonio, who was in the front passenger seat, got out of the car and, according to Taylor, began firing a gun at the four men. Taylor said that he returned Antonio's fire with his own gun, a 9-millimeter Ruger. Antonio then got back into the car with Terry and the car sped off. After setting fire to the car, they fled to Chicago, where they were ultimately arrested some two and a half months later.

_____

involved "some guys Terry was into it with," including Taylor. R. 25-18 at 94.

Although neither of the Shannons was injured in the shooting, each of the occupants of Smith's car was struck either by a bullet or a bullet fragment; Smith, who was struck a total of eight times, died of multiple gunshot wounds, including a wound to his head that was almost certainly fatal by itself. Police would later ascertain that some 26 shots had been fired from three different guns during the encounter. None of the guns was found, but investigators were able to determine that the bullets had been fired by a Sturm Ruger 9-millimeter (Taylor's gun), a Hi-Point 9- millimeter, and a third gun firing a .40 caliber Smith and Wesson cartridge. According to the prosecution's firearm and toolmark expert, Reginald Templin, the head-shot to Smith was likely fired by the Hi-Point 9-millimeter. Waukesha County Medical Examiner Dr. Lynda Biedrzycki indicated that the fatal head wound was atypical and consistent with the possibility that the bullet responsible for the wound had struck something else before hitting Smith. She agreed with the prosecutor that a bullet that had first penetrated the car's windshield could result in this type of atypical wound. The exchange of shots had left multiple bullet holes in the windshield, although witnesses for both the State and the defense agreed that at least some of those holes were left by bullets fired from the inside rather than outside of Smith's car. With one exception, Smith's wounds were inflicted from the right to left side of his body. R.25-12 at 170. Based on the forensic evidence, the prosecution theorized that Smith was turned to his left, toward the driver's side window, when he was struck, and that the shooter had fired into the car through the windshield from in front of the vehicle. Yet, Taylor said there was no room in front of the car for the shooter to have stood there, R.25-11 at 69, and Scott testified that there was so little room between the Shannon's car and

Smith's that Antonio was unable to get out of his vehicle, R. 25-10 at 183–84.

The Shannon brothers were charged with Smith's killing. They initially pleaded guilty to second-degree reckless homicide, but they were allowed to withdraw those pleas and proceed to trial. Antonio was represented by attorney Richard Hart. The Shannons proffered two alternative defense theories. First, they posited that the bullet that killed Smith was fired from inside of his own car. Toward that end, the defense presented testimony from a crime-scene reconstruction expert who was of the opinion that Smith was killed by someone in his own vehicle, R. 25-15 at 130–153, and from a second witness who said that Scott told him that he had fired a gun from the back seat of the car and had accidentally struck Smith, R. 25-15 at 62–63. Second, the defense argued that if, instead, Antonio was responsible for the shot that killed Smith, that he had only fired in self-defense after someone in Smith's car fired the first shot. Two defense witnesses testified that Miller had told them that Taylor had fired first; one of those witnesses also recounted statements from Miller to the effect that Taylor and Smith wanted to kill Terry Shannon and that Miller believed Taylor had fired the shot that killed Smith. R. 25-15 at 27–28, 47–51.

Terry and Antonio both declined to testify at the trial on the advice of counsel. As relevant here, upon being informed of that decision, the trial judge engaged Antonio in a colloquy pursuant to *State v. Weed*, 666 N.W.2d 485, 498–99 (Wis. 2003), to ensure that his waiver of the right to testify in his own defense was knowing and voluntary. In response to the judge's questions, Antonio confirmed that he understood that the decision whether to testify was "entirely for [him] to make," that

no one had made any threats or promises in an effort to influence his decision, that he had had "the opportunity to discuss [his] decision on whether to testify or not with [his trial counsel]," and that his decision was "[n]ot to testify." R. 25-15 at 212–13. Antonio's counsel, Hart, added that he and his client had been talking about the possibility of Antonio testifying in the months leading up to the trial and that "we discussed the pros and con[s], and I have given him my input and my recommendation, but it's up to him." R. 25-15 at 214.

The jury convicted both Antonio and Terry on two charges, first-degree intentional homicide while armed, in violation of Wis. Stat. § 940.01(1)(a), and intentionally discharging a firearm from a vehicle as a party to a crime, in violation of § 941.20(3)(a).

On direct appeal of his conviction, Antonio, now represented by attorney Mark Rosen, raised a single issue: whether the trial court had improperly excluded testimony from a friend of the Shannons that Kinte Scott told him, in the interim between the argument at IHOP and the shooting, that Smith was upset with Terry and had declared, "I'm gonna f*ck up Terry." *See State v. Antonio Shannon*, No. 2013AP130-CR, 2013 WL 5989695, at *1 ¶4 (Wis. Ct. App. Nov. 13, 2013) (unpublished). That testimony was offered in furtherance of the theory of self-defense. The Wisconsin Court of Appeals agreed with Antonio that Smith's out-of-court statement was admissible as proof of Smith's state of mind and that the trial court had erred in excluding Scott's testimony on this point. *Id.*, at *1 ¶ 8. But the court deemed the error harmless on two grounds. First, the jury had heard testimony from other witnesses that Smith "was out to get" Terry. *Id.*, at *2 ¶10. Second, in view of the trial record, the court discerned no real

possibility that Antonio's self-defense theory would have succeeded even with the help of Scott's excluded statement. "Five witnesses—Courtney [Taylor], Kinte [Scott], Calvin [Miller], and the two young women in the car parked across the street—described a scene of relaxed and friendly flirting and talking, with Bennie [Smith] 'laughing,' 'friendly,' and not appearing 'to be jumpy or nervous.' Having just met the men, the women were impartial witnesses." *Id.*, at *2 ¶11. Moreover, yet another disinterested witnesses, a worker filling newspaper racks with the day's papers, testified that he saw a red car—the same color as the Shannons' vehicle—circling the area moments before he heard shots ring out. *Id.*, at *2 ¶ 12. And the two women parked across the street, along with the three surviving passengers in Smith's car, testified consistently that the gunfire had erupted immediately upon the Shannons' vehicle pulling along side of Smith's car, giving rise to an inference that someone in the Shannons' car had fired first—indeed, Scott and Taylor both said exactly that in their testimony. *Id.* Given what the jury had already heard on both sides of the self-defense theory, the Court of Appeals was unconvinced that Smith's out-of-court statement would have tipped the balance in Antonio's favor. *Id.*, at *2 ¶ 13. The Wisconsin Supreme Court denied review. 843 N.W.2d 708 (Wis. 2014).

Antonio then sought postconviction relief pursuant to Wis. Stat. § 974.06 on the ground of attorney ineffectiveness, among others. Antonio argued that his trial counsel, Hart, had failed to (1) adequately look into the details of his self-defense claim, (2) properly advise him that his testimony was vital to the claim of self-defense, and (3) prepare him to testify. He also argued that his appellate counsel, Rosen, had improperly omitted to argue Hart's ineffectiveness on direct

appeal. The trial court conducted an evidentiary hearing on the claim pursuant to *State v. Machner*, 285 N.W.2d 905, 908–09 (Wis. 1979). Hart and Rosen testified at the hearing, as did Antonio, his mother Mary Myers, and other family members. Hart *inter alia* outlined the nature of his discussions with Antonio concerning the self-defense claim, what he learned from other witnesses about the basis for that claim, what he perceived to be the potential disadvantages of Antonio testifying, and why he did not think it was invariably necessary for a defendant himself to testify in support of a self-defense claim.

After hearing from Hart and the other witnesses, the judge credited Hart's testimony and rejected Antonio's assertion that Hart's conduct and advice with respect to the self-defense claim was ineffective. The court found that: (1) Hart had discussed the self-defense claim with Antonio in general terms; (2) Hart's practice was not to question a client about the details of his account early in the case for ethical reasons; (3) Hart had spoken with Antonio's mother, Mary Myers, however, and was aware of the violent history between Terry, Smith, and Taylor and of Antonio's wish to make peace between the men; (4) Hart viewed Antonio's prospective testimony recounting this history as a double-edged sword, because the prior shootings perpetrated by Smith and Taylor might have caused the jury to doubt that the Shannon brothers went looking for the men on the night of the shooting in order to make peace; (5) the risks of Antonio's testimony also included cross-examination not only on his prior convictions but also the newspaper worker's testimony that Terry's car was circling the scene just prior to the shooting and the fact that Antonio and Terry set fire to the car in the aftermath of the shooting; (6) Hart made a strategic decision to advise his client not to testify; (7) Hart went over the pros and cons of

testifying with Antonio (the court had no doubt on this point), left the decision whether to testify to Antonio, and, had Antonio decided to testify, would have gone over his testimony with him and prepared him to take the stand; (8) Hart had prevailed on self-defense claims in other cases without the defendant's testimony; (9) self-defense remained a consideration throughout the Shannons' trial and Hart argued that defense in closing to the jury; and (10) in view of the circumstances, Hart's performance was objectively reasonable under *Strickland*. Having concluded that Hart's representation was not ineffective, the court did not reach the question of prejudice. R. 25-18 at 156–162.

The court also rejected Antonio's contention that his appellate counsel, Rosen, was ineffective for not arguing Hart's supposed ineffectiveness on direct appeal of Antonio's conviction: Rosen "conducted a very thorough, lengthy investigation with respect to this case" with the help of a retained investigator and concluded that Hart was not ineffective for advising his client not to take the witness stand. R. 25-18 at 172–73. The court therefore denied Antonio's request for post-conviction relief.

The Wisconsin Court of Appeals affirmed. *State v. Antonio Shannon*, No. 2016AP2055, 2019 WL 1147628 (Wis. Ct. App. Mar. 13, 2019) (unpublished). The court noted at the outset of its discussion that Antonio acknowledged he waived his right to testify pursuant to a proper, on-the-record colloquy with the trial judge that satisfied the requirements of *State v. Weed*, *supra*, 666 N.W.2d 485. 2019 WL 1147628, at *2 ¶ 7. The court then explained why, partly in view of that colloquy, it agreed with the lower court that Antonio had not established that his trial counsel was ineffective under *Strickland*:

The circuit court's on-the-record *Weed* colloquy defeats Shannon's ineffective assistance of counsel claim, especially when coupled with evidence adduced at the postconviction hearing. Based on testimony at the *Machner* hearing, the circuit court found that trial counsel went over the pros and cons of whether or not to testify with Shannon, and that Shannon made the ultimate decision to waive his right to testify: "[Trial counsel] gave that opinion, but again, [trial counsel] always made it clear that the ultimate decision was Mr. Shannon's." Indeed, Shannon concedes that he understood at the time of trial that the decision of whether or not to testify was his alone to make. Downplaying the significance of the court's on-the- record colloquy, Shannon now suggests that trial counsel's advice somehow improperly tainted his decision not to testify. We reject Shannon's attempts to avoid responsibility for a difficult but personal decision by laying blame at trial counsel's feet.

Nor do Shannon's complaints about the adequacy of the information provided by trial counsel demonstrate deficient performance. Trial counsel's *Machner* hearing testimony included that he pursued as alternative defenses that Shannon was not the cause of Smith's shooting death or that Shannon was acting in self-defense. He testified that he worked with Terry Shannon's trial counsel on strategy and met with Shannon multiple times both before

and during the seven-day trial to develop strategy based on the evidence that came in. Trial counsel testified that whether the defendant testifies is "always an issue" when raising self-defense, and that "[y]ou have to look at everything and make a judgment call, and all that goes into what I talk to the client about." Trial counsel testified that he had "argued in self-defense before where I didn't put clients on [the stand] and I have been successful at it."

Based on the record and the evidence presented at the *Machner* hearing, the circuit court found that trial counsel discussed the pros and cons of testifying with Shannon and explained to Shannon "that he could not put him on the stand just to testify about self-defense" and that "there were a number of issues that Mr. Shannon would have been questioned on, including the fact that he fled the State with his brother, including the fact that they burned out the car that they were in when the shooting took place, all of which made him look guilty." The court found that trial counsel "told him to keep thinking about it" so he could "make the decision at the last minute depending upon how the evidence went in," and that if Shannon had decided to testify, counsel "would then have prepared Mr. Shannon to testify on his self-defense theory."

We accept the circuit court's factual findings and credibility determinations and conclude

> that trial counsel's performance was objectively reasonable. We will not by hindsight second-guess trial counsel's rational conduct. Trial counsel did not perform deficiently. As such, postconviction counsel's failure to raise this claim does not constitute ineffective assistance of postconviction counsel. *See State v. Ziebart*, 673 N.W.2d 369 ¶ 15 (Wis. Ct. App. 2003).

2019 WL 1147628, at *2–*3, ¶¶ 9–12 (footnote omitted). The Wisconsin Supreme Court again denied review. 931 N.W.2d 526 (Wis. 2019).

Antonio then presented his ineffectiveness claims to the district court. But that court concluded that the state courts had explicitly and reasonably applied *Strickland* in rejecting these claims. *Shannon v. Foster*, No. 15-C-604, 2020 WL 6263005, at *6 (E.D. Wis. Oct. 23, 2020). Among other points, the district court noted that: (1) Hart was not unreasonably concerned that having Antonio recount the details of the prior shooting incidents for the jury risked undermining the notion that Antonio and his brother were seeking to make peace with Smith and Taylor on the night of the shooting and were not trying to ambush them. (2) Antonio's testimony was not essential to the claim of self-defense, in view of the trial judge's finding that the existing evidence was sufficient to create a jury issue on the claim and therefore to instruct the jury on self-defense. (3) In view of the foregoing points, it was not unreasonable for Hart to advise Antonio not to testify. (4) Contrary to Antonio's premise, self-defense was not the only defense available to him at the conclusion of the case. The evidence also supported the notion that the fatal shot to Smith was fired from within his own car. A defense expert had

testified in support of that theory, and several witnesses had recounted statements to the effect that Taylor, not Antonio, had fired the first shot and that Smith was killed by friendly fire. Notwithstanding the adverse testimony from the medical examiner and the prosecution's firearms expert, counsel for both defendants argued that the evidence was insufficient to show beyond a reasonable doubt who was responsible for the fatal shot *and* that Antonio had fired in self-defense after Taylor opened fire first. In the district court's view, neither line of argument was unreasonable in view of the evidence presented to the jury, credibility problems with the State's witnesses, and the State's burden of proof. The fact that the jury returned guilty verdicts did not by itself demonstrate that Hart's trial strategy and counsel was ineffective. *Id.*

## II.

In support of his contention that the state courts unreasonably applied *Strickland*, Antonio renews the three arguments he made below. First, he contends that his trial counsel, Hart, did not adequately investigate his claim of self-defense before trial, in that he did not ask Antonio to articulate in any detail his version of the events leading up to the shooting. Second, he contends that Hart unreasonably advised him not to testify while at the same time failing to advise Antonio that his testimony was essential if the claim of self-defense was to have any chance of success. Third, Antonio argues that Hart did not prepare him to take the witness stand, a failure which he insists cannot be justified given how critical his own testimony was to the claim of self-defense.

In order to obtain a writ of habeas corpus, Antonio must show that the state court decision rejecting his claim of attorney ineffectiveness was contrary to, or involved an

unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, 28 U.S.C. § 2254(d)(1), or that the decision was based on an unreasonable determination of the facts, *id.* § 2254(d)(2). The relevant state court decision for purposes of our review is the last state court decision reaching the merits of Antonio's claim, which in this case is the decision of the Wisconsin Court of Appeals. *Weaver v. Nicholson*, 892 F.3d 878, 883 (7th Cir. 2018) (citing *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018)).

Antonio does not argue that the state appellate court's decision is contrary to clearly established federal law. The relevant precedent, of course, is *Strickland*. The Wisconsin Court of Appeals' decision cited *Strickland*, recounted the standard it articulates for a claim of ineffectiveness, and proceeded to apply that standard. 2019 WL 1147628, at *2 ¶8.

What Antonio does argue is that the Wisconsin Court of Appeals' decision represented an unreasonable application of federal law, *i.e.*, that although the court identified the correct legal rule, its decision reflects an unreasonable application of that rule to the facts of the case. § 2254(d)(1). To prevail on such a claim, it is not enough for Antonio to show that the state court's decision was incorrect, or to convince us that we would have granted him relief on his ineffectiveness claim were we entertaining the claim in the first instance. As a federal court addressing a request for a writ of habeas corpus, it is not our role to decide whether the state court's decision was right or wrong. Our role is to assess the reasonableness of the state court's application of federal law. Thus, in order to obtain habeas relief, a petitioner must show that the state court's decision was "objectively unreasonable, not merely wrong; even clear error will not suffice." *Woods v. Donald*, 575 U.S.

312, 316, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702 (2014)). By design, this is a difficult standard to meet. *Ibid.* A writ of habeas corpus may issue only if the state court's decision was so lacking in justification that it is beyond the realm of fair-minded disagreement—in other words, that no reasonable jurist could agree with it. *Harrington v. Richter*, 562 U.S. 86, 102–03, 131 S. Ct. 770, 786–87 (2011); *Wilber v. Hepp*, 16 F.4th 1232, 1248 (7th Cir. 2021) (collecting cases), *pet'n for cert. filed*, No. 21-1053 (U.S. Jan. 26, 2022).

Antonio also maintains that in one respect, which we describe below, the Wisconsin Court of Appeals' decision is based on a factual error. 28 U.S.C. § 2254(d)(2). In order to show that the state court's decision was based on an unreasonable determination of the facts, Antonio must show that the factual determination in question is unreasonable in light of the evidence presented in the state court proceeding. *Id.* We presume that the state court's factual determination is correct, and it is Antonio's burden to rebut that presumption by clear and convincing evidence. § 2254(e)(1); *Wood v. Allen*, 558 U.S. 290, 293, 130 S. Ct. 841, 845 (2010).

As we have said, *Strickland* is the controlling Supreme Court precedent here. *Strickland* requires Antonio to show both that his attorney's performance was deficient and that it was prejudicial. 466 U.S. at 687, 104 S. Ct. at 2064. To establish that it was deficient, Antonio must show that it fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S. Ct. at 2064. The range of attorney performance that will meet the Sixth Amendment's guarantee of effective representation is wide. *Id.* at 689, 104 S. Ct. at 2065. "No particular set of detailed rules for counsel's conduct can satisfactorily take

account of the variety of circumstances faced by defense coun-
sel or the range of legitimate decisions regarding how best to
represent a criminal defendant." *Id.* at 688–89, 104 S. Ct. at
2065. Our analysis begins with a "strong presumption" that
counsel in fact provided effective representation. *Kimmelman
v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586 (1986). "The
benchmark for judging any claim of ineffectiveness must be
whether counsel's conduct so undermined the proper func-
tioning of the adversarial process that the trial cannot be re-
lied on as having produced a just result. *Strickland*, 466 U.S. at
686, 104 S. Ct. at 2064. If Antonio is able to show that his coun-
sel's performance was deficient, then he must establish preju-
dice by showing that there is a reasonable probability that but
for his counsel's errors, the outcome of the proceeding would
have been different. *Kimmelman*, 477 U.S. at 381, 106 S. Ct. at
2586; *Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068.

*Strickland* sets forth a deferential standard for reviewing
attorney effectiveness, and when we are reviewing a claim of
attorney ineffectiveness in a habeas proceeding, the con-
straints that section 2254 imposes render our review "doubly
deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129
S. Ct. 1411, 1420 (2009). "When § 2254(d) applies, the question
is not whether counsel's actions were reasonable. The ques-
tion is whether there is any reasonable argument that counsel
satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at
105, 131 S. Ct. at 788.

For purposes of context, we begin with a point that the
Wisconsin Court of Appeals emphasized: Antonio made the
decision not to testify on his own behalf. The facts as found
by the circuit court and accepted by the Wisconsin appellate
court established that Antonio's trial counsel, Hart, provided

him with an explanation as to the pros and cons of testifying, and properly left the decision to Antonio. Counsel warned Antonio that testifying could undermine his self-defense argument in that it would allow an exploration of his actions that indicated guilt, including the fact that he and his brother set fire to the vehicle they were in and then fled the State. He further cautioned Antonio that testifying would place in his hand the Hi-Point gun that was responsible for the fatal wound to Smith's head: Antonio had told his attorney that he possessed the Hi-Point, and Hart made clear that Antonio could not lie in his testimony. (Recall that although Smith had eight gunshot wounds, the fatal shot to the head was likely from a 9mm Hi-Point, according to Templin.) Those are all proper considerations in determining whether testifying would be beneficial, and it was not deficient performance to present them to Antonio. The trial court, in turn, conducted a *Weed* colloquy confirming that Antonio understood his right to testify and had made a voluntary and intelligent decision not to take the witness stand.

To be sure, the fact that Antonio decided not to testify does not foreclose his claim of ineffectiveness as to Hart. Antonio's claim, properly understood, is that his decision not to testify was tainted by Hart's purported failures of investigation, preparation, and advice vis-à-vis Antonio's prospective testimony—specifically, that Hart did not apprise himself of the details necessary to appropriately advise Antonio on whether or not to testify, that he failed to convey to Antonio that it was imperative Antonio testify in support of the self-defense claim, and that he did not prepare Antonio to take the witness stand should he decide to testify. *See United States v. Goodwin*, 770 F.2d 631, 637 (7th Cir. 1985) ("It is primarily the responsibility of the defendant's counsel … to advise the defendant on

whether or not to testify and to explain the tactical advantages and disadvantages of doing so."); *Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990) (applying *Strickland* to petitioner's claim that his counsel improperly advised him not to testify), *modified in other respects by Willis v. Aiken*, 8 F.3d 556, 563-66 (7th Cir. 1993); *cf. Hartsfield v. Dorethy*, 949 F.3d 307, 312–13 (7th Cir.) (ineffectiveness claim is the appropriate vehicle for contention that counsel violated defendant's right to testify), *cert. denied*, 141 S. Ct. 270 (2020). We take these arguments in turn.

Antonio's first argument posits that Hart never delved into the specifics of his self-defense claim with him and therefore lacked sufficient knowledge of the basis for the claim to provide proper advice as to whether Antonio should testify. But there is no reason to believe that Hart lacked a proper understanding of Antonio's possible testimony, including the potential testimony as to the history of the shooting incidents involving Taylor and Smith and his brother Terry Shannon. As the district court noted, Antonio's counsel testified that he did not request specific details of Antonio, not that he did not discuss the case with his client. Indeed, Hart testified at the post-conviction hearing that in advance of the trial he did speak with Antonio generally about what he might say on the witness stand. Hart also discussed the case with Antonio's mother, and from that conversation he was aware of the prior incidents between Terry Shannon and Smith and Taylor. Myers also provided Hart with an affidavit from Shakyra Ellis, the mother of Terry Shannon's children, which described these prior incidents. Accordingly, the Wisconsin circuit court, following the evidentiary hearing, found that Antonio's attorney was aware of the history between Taylor, Smith, and Terry Shannon. There is no basis in the record to

conclude that Antonio's attorney lacked an adequate awareness of the potential testimony Antonio could provide.[2]

Based on his understanding of what Antonio would say in support of his self-defense claim, Hart made a strategic decision to recommend that his client not take the witness stand. In Hart's words, the prospect of Antonio's testimony was a "two-edged sword." R. 25-18 at 12. Certainly it would give Antonio the opportunity to recount what he knew about the prior altercations between his brother and Taylor and Smith (assuming no insurmountable hearsay problems) and to say that it was his intent on the night of the shooting to try and make peace between the antagonists. But Hart viewed it as a stretch to say that Antonio and his brother were pursuing peace when they drove up to Smith's car at 3:30 in the morning armed with a gun. In his view, the jury might infer from the prior confrontations and Antonio's possession of a firearm

---

[2] Hart testified that, apart from whatever his client might have already told the police, it was his practice not to elicit the specific details of a client's prospective testimony before trial, in order to avoid the ethical quandary that might arise should the client's story change over the course of the trial. Antonio contends that it was improper for Hart to assume that he might lie and to avoid eliciting the pertinent details of his prospective testimony for that reason. We need not pass judgment on Hart's rationale. What is relevant for our purposes is that although Hart did not query Antonio about the specifics of his self-defense claim, he did discuss Antonio's prospective testimony with him in general terms and was aware of the material details of the self-defense claim from Antonio's mother and other sources. The circuit court explicitly found as much, R. 25-18 at 156–58, and the appellate court adopted the circuit court's factual findings, 2019 WL 1147628, at *3 ¶ 12, which dispels Antonio's suggestion that the state courts never addressed whether Hart was properly apprised of what Antonio would say if called to testify.

that the intent of the Shannon brothers was anything but benign. That was a reasonable strategic assessment.

Nonetheless, as Antonio sees things, self-defense was the only viable defense available to him when the time came for him to decide whether to testify or not. The so-called "no-fault" defense, which postulated that the fatal shot was fired by one of the occupants of Smith's car, was in Antonio's view rendered defunct by Templin's testimony that the fatal shot to Smith likely came from a Hi-Point firearm, which happens to have been the make of gun that Antonio was carrying.[3] That left the claim of self-defense, which in Antonio's view stood a chance of success *only* if he took the witness stand to explain why he and his brother had sought out Taylor and Smith that night and that he fired at Smith's car only after the occupants opened fire first and it became necessary for him to defend himself by firing back.

We pause here to address a related factual point. The circuit court found that Hart discussed the pros and cons of testifying with Antonio before he decided not to testify. R. 25-18 at 160. The appellate court in turn noted this finding in the course of rejecting Antonio's claim of ineffective assistance. 2019 WL 1147628, at *3 ¶ 11. Antonio disputes that Hart did any such thing and asserts that the state court's finding was

---

[3] We accept the premise of Antonio's argument although, as the district court pointed out, there was other evidence at trial pointing to the occupants of Smith's car as the source of the fatal shot and both defense counsel did argue the "no fault" defense in closing. The trial judge, who also presided over Antonio's post-conviction hearing, found that the viability of this defense was "seriously diminished" in light of both Templin's testimony and that of the medical examiner, Dr. Biedrzycki. R. 25-18 at 158–59.

unreasonable in light of the evidence presented. We disagree. Hart testified that he discussed with Antonio why, in his opinion, Antonio should not testify. R. 25-18 at 13–14, 17, 21, 30–31, 43. As the appellate court noted, Hart explained to Antonio that once he took the witness stand, he could not limit his testimony to self-defense and he would be subject to cross-examination about his post-shooting behavior. 2019 WL 1147628, at *3 ¶ 11. The post-conviction court also credited Hart's testimony that he had discussed Antonio's prospective testimony with him in general terms. R. 25-18 at 158, 160. Antonio himself agreed that Hart had consulted with him regarding his testimony and that he understood it was up to him whether or not to take the stand. R. 25-18 at 127, 129-30. Thus, Antonio has not shown by clear and convincing evidence that the state court's factual finding on this point was unreasonable.

This brings us to the heart of Antonio's second argument, which assumes that his testimony could only have strengthened an otherwise weak self-defense case and that it was unreasonable for Hart to advise him not to testify. Hart's obligation, in Antonio's view, was to advise him that his testimony was critical to his claim of self-defense and that he therefore must take the stand if the defense was to stand any chance of success. But this argument fails to recognize that there was other testimony in the record supporting Antonio's self-defense claim; it also fails to recognize that his testimony had the potential to undermine a self-defense argument.

This is not a case in which, absent the defendant's own testimony, no other testimony in the record supported the claim of self-defense. At trial, three witnesses testified that the occupants of Smith's car initiated the shooting and that they

were seeking to kill Terry Shannon. Logan Tyler, a close and longtime friend of the Shannon brothers, testified that Scott, one of the passengers in Smith's car, admitted to him that they had been looking for Terry Shannon after the argument at IHOP and toward that end had first driven by the apartment where the mother of Terry's children was living. R. 25-15 at 61. Scott also admitted to Tyler that when Terry and Antonio later pulled alongside of Smith's car, he (Scott) had fired first from the backseat of Smith's car in a panic and that he accidentally hit Smith. R. 25-15 at 62–63. Fradario Brim testified that Miller, another passenger in Smith's car, told him that Taylor (also in Smith's car) fired first once the Shannons pulled up and that Taylor and Smith had a "beef" with Terry Shannon and wanted to kill him. R. 25-15 at 27–28. Dartavis Shelton said that in a separate conversation with Miller, Miller told him that Taylor admitted to opening fire as soon as the Shannons drove up and to firing the shot that killed Smith. R. 25-15 at 47–51.

There was also testimony in the record alluding to Antonio's desire to make peace between the parties. Taylor acknowledged in his testimony that Antonio previously had tried to smooth things over between his brother and Smith and Taylor. R. 25-11 at 78. And although Antonio himself never testified, a Racine police officer who knew Antonio as a family friend and had spoken to Antonio while he and his brother were on the run, did testify and recounted Antonio's statement to him that his intent on the night of the shooting was to try and "squash the beef" and "calm things down." R. 25-12 at 182–83.

Therefore, testimony in the record supported the self-defense theory even without Antonio's testimony. Hart in turn

emphasized all of this testimony in his closing argument to the jury. *E.g.*, R. 25-16 at 82–85, 88–90. In view of his prior experience with clients who had prevailed on self-defense claims without testifying, Hart could have reasonably believed that Antonio's testimony was not essential to the success of his defense.

At the same time, there were clear and obvious risks associated with Antonio's own testimony. If Antonio testified, then his testimony would have definitively tied him to the Hi-Point weapon that Templin testified was the likely source of the fatal shot to Smith. Recall that police had not recovered any of the weapons used in the shooting, so unless and until Antonio testified and identified the weapon that he was carrying, there was no testimony tying him to that particular gun. (We can readily assume that the prosecution would have queried Antonio on this point: it argued in closing that because the Hi-Point shells were found outside of Smith's car, Antonio was the individual most likely to have fired the Hi-Point. R. 25-16 at 126.) Antonio's testimony also would have opened the door to questioning as to his criminal history and his actions following the shooting, including the attempt to destroy evidence by setting fire to the vehicle he and his brother were driving and their flight from the State. It may be true that Antonio's criminal history was no worse than that of other key witnesses, and that there was already testimony in the record that he and his brother had set fire to their car and fled Racine after the shooting. But a prosecutor's ability to cross-examine Antonio about these points could only have magnified their significance in the jurors' minds. Antonio also argues that he would have testified that he was trying to smooth over the disagreement between Terry Shannon and Scott, but again, cross-examination by the prosecutor would

undoubtedly have highlighted the circumstances that cast doubt on Antonio's portrayal of himself as a peacemaker.

Third and finally, Antonio contends that Hart was ineffective for failing to prepare him to testify. This argument again assumes that his testimony was critical to the defense and that it was necessarily incompetent not to prepare him for the witness stand. But Hart testified that he would have discussed Antonio's testimony with him if and when Antonio made the decision to testify, R. 25-18 at 28, and the postconviction court credited that testimony. R. 25-18 at 160. As we have discussed, Hart was also aware of the factual basis for the self- defense claim, he discussed the pros and cons of testifying with Antonio, there was other testimony in the trial record supporting a self-defense claim, and there were real risks associated with Antonio testifying. The record indicates that Antonio had information he needed to make an intelligent decision and that he decided not to testify, and there is no dispute that Antonio confirmed for the record his decision not to testify after a proper colloquy with the trial judge. Given that decision, Hart cannot be faulted for failing to prepare Antonio to take the stand.

The Wisconsin appellate court applied *Strickland* to the facts presented and reached a decision that was consonant with *Strickland*'s framework for evaluating attorney effectiveness. Having concluded that the appellate court's finding that Hart provided effective assistance of counsel to Antonio was not unreasonable, we need not separately address whether any purported ineffectiveness on Hart's part prejudiced Antonio.

Antonio pursues a secondary claim that his postconviction counsel, Rosen, was ineffective for failing to argue on direct

appeal that Antonio's trial counsel, Hart, was ineffective. Because the evidence did not show that Hart was ineffective, postconviction counsel was not ineffective in failing to pursue this claim on direct appeal of Antonio's conviction. Appellate counsel is not obliged to make a losing argument. *Whitehead v. Cowan*, 263 F.3d 708, 731 (7th Cir. 2001). For all of the reasons we have discussed, the issue of ineffective assistance was not clearly stronger than the evidentiary issue that appellate counsel did raise on appeal. And in any case, given the state courts' determination that Hart was not ineffective, and our own finding that this determination was not an unreasonable application of *Strickland*, Antonio was not prejudiced by Rosen's decision not to pursue the ineffectiveness claim.

## III.

Antonio has not shown that Wisconsin Court of Appeals' decision that his trial counsel provided him with effective assistance represents an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts. Nor has he shown that the state court's decision that his postconviction counsel was not ineffective for failing to pursue the claim on direct appeal was unreasonable. The district court properly denied Antonio's petition for a writ of habeas corpus.

AFFIRMED