In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2073

DONALD A. PIERCE,

*Petitioner-Appellant,*

*v.*

FRANK VANIHEL,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:20-cv-00177-JPH-MG — **James Patrick Hanlon**, *Judge.*

_____

ARGUED NOVEMBER 7, 2023 — DECIDED FEBRUARY 22, 2024

_____

Before EASTERBROOK, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* An Indiana jury convicted Donald
Pierce of four counts of felony child molesting and of being a
repeat sexual offender for molesting the ten-year-old daugh-
ter of his then-fiancée. At trial, his lawyer failed to object to
witness testimony that violated an Indiana evidentiary rule.
Pierce later petitioned for post-conviction relief in state court,
contending that his trial counsel's failure to object deprived
him of constitutionally adequate representation. The Indiana

Court of Appeals denied the petition after finding that
Pierce's counsel's failure to object was knowing and strategic,
and did not rise to the level of constitutionally deficient per-
formance. Pierce now seeks habeas relief, arguing that the
state appellate court unreasonably applied Supreme Court
precedent and otherwise based its decision on an unreasona-
ble fact determination. We affirm.

## I. Background

### A. Factual Background

In June 2008, Indiana charged Petitioner Donald "Andy"
Pierce with three counts of Class "A" felony child molesting,
one count of Class "C" felony child molesting, and being a
repeat sexual offender. Pierce went to trial, and a jury con-
victed him on all counts.

The convictions stem from Pierce's molestation of J.W., the
ten-year-old daughter of his then-fiancée. Pierce started da-
ting J.W.'s mother in 2004. He soon moved in with J.W. and
her mother, and in 2006 began to molest J.W. According to
J.W., the molestations occurred approximately every other
weekend for a year and included sexual intercourse, oral sex,
and fondling.

### B. Procedural Background

#### 1. Trial and Direct Appeal

There was no physical evidence of the molestation, and
J.W. was the only eyewitness. The state thus sought to prove
its case through the testimony of J.W. and the several adults
in whom she confided. The state's case consisted of seven wit-
nesses, testifying in the following order: J.W.'s paternal
grandfather, J.W.'s father, an investigating sheriff's deputy,

J.W.'s mother, J.W., and two medical witnesses. Most of these witnesses testified to what and when J.W. told them about Pierce's conduct. Pierce's trial counsel did not object to this sequence of witnesses.

J.W.'s paternal grandfather testified first, informing the jury that J.W. initially told him about the "problems she was having" with Pierce in 2007, when she divulged to him that she once woke up to find Pierce "fooling around" with her. He did not contact law enforcement, but instead agreed to let J.W. tell her mother.

J.W.'s grandfather suffered a heart attack not long after J.W. told him about the molestation, and by the time he recovered, J.W. had yet to tell her mother. He testified that J.W. told him that she had not talked to her mother because "what had happened was consensual" and "fun." J.W.'s grandfather called J.W.'s maternal grandfather several days later to tell him about the molestation.

J.W.'s father testified second, reporting that he notified the police after hearing about the allegations against Pierce from J.W.'s mother. He testified that J.W. never told him about the molestation. On cross-examination, he reiterated that when he spoke to the police, "[a]ll he knew was … that [Pierce] had touched her," and that he did not know any "other specifics about the amount of times or anything like that."

Sheriff's Deputy Debra Young was the state's third witness. Young testified that she first heard about the allegations from J.W.'s father. Young subsequently contacted the Indiana Department of Child Services, which set up a forensic interview with J.W. In the meantime, Young also spoke with J.W.'s mother, who informed her J.W. had revealed that there had

been "incidents with [Pierce] that he had been in her bedroom and she had awakened with him on top of her."

J.W. underwent two forensic interviews in the weeks that followed, the first of which took place the day after J.W.'s father contacted the police. In that first interview, J.W. stated that Pierce had raped her "approximately four times," beginning around Valentines Day of 2007. J.W. also described waking up with Pierce on top of her and raping her.

Young testified that second interviews are "not uncommon," and that a second interview was necessary after investigators "obtained more information from family members." After her first interview, J.W. told family members that she "hadn't told the truth" and "had actually lied the first" time. Specifically, J.W. revealed that it "didn't happen exactly like she had said" because she "hadn't been asleep during the incidents."

So, J.W. sat for a second interview several weeks later, at which she offered a somewhat different version of her story consistent with the new account divulged to family members. J.W. informed the interviewers that Pierce's conduct began around Easter of 2006, not Valentines Day of 2007, and that she was awake, not asleep, at the time of the molestation. Pierce had asked if she "wanted to play a game," "trusted him," "loved him," and "loved her mom." At that point, he removed their clothing and the two started "wrestling." Pierce then began "fondling her, touching her private parts with his hands," eventually "putting his private part in her private part," and "mov[ing] up and down on top of her." J.W. claimed that similar conduct happened "multiple times … pretty much … every time that they were alone" on weekends spent at her mother's house. J.W. explained that she had

not revealed this information during the first interview because she was "scared" and "didn't want to hurt her mom."

J.W.'s mother testified next, recounting that Pierce and J.W. seemingly "got along well," and that Pierce "watched [J.W.] a lot" while she was working. She testified that she discovered the "inappropriate relations" between the two in May 2007, after her parents informed her that J.W. had confided in her paternal grandfather that Pierce had "touched her." When she confronted her daughter with this information, J.W. told her that Pierce "had come into her room at night a few times."

J.W.'s mother further testified that J.W.'s story later changed, which prompted her to set up the second interview. Specifically, J.W. revealed that Pierce "didn't come into her room at night," but instead "asked her to come into the bedroom one day" while her mother was at work, and that this "happened for a long time for about a year or more." According to J.W.'s mother, J.W. stated that she had not disclosed these details during the first interview because she was afraid that her mother was going to "hate her or be mad at her."

On cross-examination, Pierce's trial counsel questioned J.W.'s mother about her daughter's "changing story." J.W.'s mother stressed that J.W. was "not a liar," but simply "didn't want to tell me all the rest of the details."

J.W. took the stand after her mother. She described the alleged conduct, beginning with the "wrestling," and Pierce later telling her to take off her clothes, getting on top of her, and molesting her. J.W. told the jury that this first happened about a year and a half before she told her grandfather, and that she had not given him "all the details." She testified that

she did not speak with her mother because she "couldn't look [her mother] in the face and tell her."

The rest of J.W.'s testimony adhered to the version of events she described in the second interview. J.W. explained that she did not tell the interviewers "exactly" what happened during the first interview because she did not want to hurt her mother. She insisted that the first interview was "a lie," telling the jury that she ultimately gave a truthful account in the second interview because she "couldn't lie."

On cross-examination, Pierce's trial counsel highlighted the inconsistencies in J.W.'s story. Counsel asked whether J.W. ever spoke with her father or mother about the conduct, to which J.W. responded that she did not "go into details" with them. Counsel also repeatedly asked whether the varying versions of J.W.'s testimony were lies, and J.W. confirmed that anything inconsistent with her second interview was inaccurate. When counsel asked J.W. which parts of her story she lied about, J.W. responded, "the part of me being asleep."

The state closed its case with the testimony of two medical witnesses. The first, a therapist, testified about the behaviors and characteristics of child sexual abuse victims. The second, a nurse who examined J.W., testified that she did not find any physical injuries on J.W. during her examination, but that it was common not to observe injuries in child rape victims.

Pierce called Deputy Young as his only witness. Young's testimony largely overlapped with her earlier statements, with Pierce's trial counsel drilling down on the inconsistencies between J.W.'s two interviews. When Pierce's counsel asked Young whether J.W. "change[d] her story," Young responded "yes," explaining that J.W. stated she needed a

second interview because she "hadn't been truthful the first time" and had "lied about how and when it happened."

During Pierce's closing statement, trial counsel argued that it was plausible for a child to fabricate a molestation story. Counsel repeatedly attacked J.W. as a "liar," highlighting the inconsistencies between her first and second interviews and her numerous versions of the events. The evidence, counsel stressed, was "essentially one person's many, many versions" of what transpired.

Despite these efforts to discredit the only eyewitness, the jury convicted Pierce on all four counts of child molestation and subsequently found he was a repeat sexual offender. The state circuit court sentenced Pierce to 124 years' imprisonment.

Pierce appealed on unrelated grounds. *See Pierce v. State*, 2010 WL 4253698 (Ind. Ct. App. 2010). The Indiana Court of Appeals affirmed his convictions, but it remanded to correct a sentencing error. Pierce then appealed to the Indiana Supreme Court, which similarly affirmed the convictions but exercised its discretion under the Indiana Constitution to revise his sentence to 80 years. *See Pierce v. State*, 949 N.E.2d 349, 352–53 (Ind. 2011).

### 2. Post-Conviction Proceedings

Pierce subsequently pursued post-conviction relief, relying in part on an Indiana hearsay doctrine. Indiana evidentiary rules limit the admission of a witness's prior statement as substantive evidence to certain situations. *See* Ind. Evid. R. 801(d); *Appleton v. State*, 740 N.E.2d 122, 124 (Ind. 2001). Among these limitations is the "drumbeat" rule, under which the state may not elicit a victim's out-of-court statements from

other witnesses before the victim herself testifies. *See Modesitt v. State*, 578 N.E.2d 649, 651–52 (Ind. 1991); *Stone v. State*, 536 N.E.2d 534, 536 (Ind. Ct. App. 1989). The danger of this "drumbeat repetition" testimony is that it impairs the accused's cross-examination rights by rendering the victim's account increasingly unimpeachable as witnesses repeat her version of events. *Modesitt*, 578 N.E.2d at 652. "By putting into evidence the victim's out of court charges" through "separate and repetitive witnesses *prior to* calling the victim herself, the prosecutor effectively precludes [the accused] from effective cross-examination" because "the victim's veracity has been, in essence, vouchsafed by permitting the … witnesses to repeat the accusations of the victim." *Id.* at 651 (cleaned up).

### a. State Circuit Court

Pierce first petitioned pro se for post-conviction relief in state court in 2012, and amended his petition in 2017 after obtaining counsel. Among other alleged errors, Pierce invoked the drumbeat rule to argue that he received ineffective assistance of counsel due to trial counsel's failure to object to the sequence of the adult witnesses' hearsay testimony.

The Indiana circuit court held an evidentiary hearing on the petition at which Pierce's trial counsel testified. Pierce's counsel informed the court that the "defense solely was that J.W. was a liar," noting that she had observed a similar trial in front of the same judge, so she "kind of knew what he let in and what he didn't let in." When asked whether she was "aware … of the possibility of objecting to [the sequence of] testimony as drumbeat testimony," Pierce's counsel first responded, "[a]s what, I'm sorry?" After clarification, she added, "[u]m, no, that's not one I would have made for this, no."

The state circuit court denied Pierce's petition. Noting that Pierce's trial counsel had observed the trial judge in similar cases, was familiar with his rulings, and chose not to object in order to downplay the testimony, the state court determined that her failure to object to the drumbeat testimony was a reasonable strategic choice that did not rise to the level of constitutionally deficient performance. Additionally, the court found that Pierce had not shown he had suffered prejudice as a result of his trial counsel's failure to object.

### b. State Court of Appeals

The Indiana Court of Appeals affirmed the circuit court's ruling in a split decision. The majority of the court agreed that Pierce's trial counsel's failure to object was strategic. But, rather than reasoning as the circuit court had that Pierce's trial counsel was trying to downplay the testimony, the majority found that she did not object because she was trying to "paint J.W. as a liar" and have the jury "hear as many different versions of J.W.'s 'stories' as possible." The majority did not discuss Pierce's trial counsel's testimony at the post-conviction hearing. It instead relied exclusively on the trial transcript, reasoning that as early as its opening statement, counsel tried to portray J.W. as a liar. The majority concluded:

> Trial counsel's decision to permit the various witnesses to then inform the jury of the details of J.W.'s recounting of Pierce's molestations to each of them was counsel's explicit strategy. Trial counsel *wanted* the jury to hear all of the different versions of the molestations that J.W. had reported because counsel wanted to use the variances among those versions to undermine J.W.'s credibility. The fact that that strategy did

> not work out for Pierce does not demonstrate
> that Pierce received ineffective assistance of
> counsel.

Because the state court concluded that Pierce's counsel was not constitutionally deficient, it did not address whether he had suffered any prejudice.

One judge dissented, concluding that Pierce's trial counsel "simply took a fatalistic approach to trial and wholly failed to challenge any testimony by any State witness, including drumbeat repetition of J.W.'s allegations." The dissent pointed out that trial counsel's purported strategy of allowing the jury to hear the evolving versions of J.W.'s account would not have been "undermined" had she invoked the drumbeat rule and insisted that J.W.'s testimony "not be *preceded* by a parade of witnesses providing much detail and explaining any inconsistency." Instead, trial counsel "stood idly by while the jury was inundated with drumbeat repetition of J.W.'s allegations, even before J.W. testified," thereby "vouchsafing" J.W.'s testimony before it even took place and eroding Pierce's presumption of innocence. The dissent also concluded that trial counsel's failure to object was prejudicial given the importance of J.W.'s credibility to the case and the absence of physical evidence, eyewitnesses, or other corroboration.

Pierce appealed the decision to the Indiana Supreme Court, which denied review. *See Pierce v. State*, 143 N.E.3d 955 (Ind. 2020).

### c. Federal Habeas Petition

Pierce subsequently brought this federal habeas petition in the Southern District of Indiana, which the district court denied. The district court held that the Indiana Court of

Appeals reasonably applied clearly established law in determining that Pierce's trial counsel strategically chose not to object to the "drumbeat" testimony and therefore did not provide deficient representation. The district court nevertheless granted Pierce a certificate of appealability, citing the dissent in the state court of appeals.

## II. Analysis

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides the statutory authority for federal courts to issue habeas corpus relief for persons in state custody. We review the district court's decision de novo, "but our inquiry is an otherwise narrow one." *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc). Under AEDPA, a federal court cannot grant habeas corpus relief unless the state court's adjudication of the claim (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d); *Schmidt*, 911 F.3d at 477. In applying these standards, we look to the last reasoned state court decision to decide the merits of the case, "even if the state's supreme court then denied discretionary review." *Thurston v. Vanihel*, 39 F.4th 921, 928 (7th Cir. 2022) (quoting *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc)).

Pierce claims that the Indiana Court of Appeals made two interrelated errors under § 2254(d). First, he argues that the Indiana Court of Appeal's decision was "based on an unreasonable determination of facts" because it unreasonably found that trial counsel's failure to object was a knowing strategic decision. *See* 28 U.S.C. § 2254(d)(2). Second, he contends that it unreasonably applied established Supreme Court

precedent in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See id.* at § 2254(d)(1). We address each argument in turn.

**A. Section 2254(d)(2)**

"A petitioner's challenge to a state court decision based on a factual determination under § 2254(d)(2) will not succeed unless the state court committed an 'unreasonable error,' and § 2254(e)(1) provides the mechanism for proving unreasonableness." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 549 (7th Cir. 2008); *see also Thurston*, 39 F.4th at 929 n.2. Under § 2254(e)(1), "[w]e start with the presumption that a state court's determination of fact is correct." *Winfield v. Dorethy*, 956 F.3d 442, 452 (7th Cir. 2020). To rebut that presumption, a petitioner must show by clear and convincing evidence that the finding was unreasonable. *Id.* This is a "stringent standard." *Morgan v. Hardy*, 662 F.3d 790, 799 (7th Cir. 2011). "[E]ven if 'reasonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's determination.'" *Wood v. Allen*, 558 U.S. 290, 301 (2010) (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006) (alterations omitted)).

The Indiana Court of Appeals determined that Pierce's trial counsel made a knowing, strategic decision not to object to the drumbeat testimony and Pierce does not put forward clear and convincing evidence demonstrating the state court's conclusion was unreasonable. To the contrary, the state court had before it sufficient evidence from which to conclude Pierce's counsel intentionally refrained from objecting because she wanted to make J.W. out as a liar by emphasizing the evolution of J.W.'s shifting accounts over time, not because she was unaware of the rule. In trial counsel's opening statement, for example, she explained to the jury that it would

see how J.W.'s tale "expanded" over "three short weeks." Trial counsel continued:

> All sorts of new … details emerged. To cover up the lies, she told the first time, she said I lied about what I said the first time. From there, [J.W.] just kept lying. Desperate people do desperate things. [J.W.] has told seven versions. Do they match? No they don't. You ladies and gentlemen *are going to get to hear all of them*. Please listen to the[m] explicitly. Pay attention how the stories *keep getting bigger and bigger*.

At the end of her opening statement, Pierce's counsel again urged the jury to "[p]ay attention to how the versions keep getting bigger and better." Then, as the adults testified, Pierce's counsel ensured that each witness informed the jury of the details of J.W.'s accounts and effectively cross-examined them about J.W.'s changing story. When J.W. eventually took the stand, Pierce's counsel highlighted the inconsistencies in her story—inconsistencies the jury had heard firsthand.

While Pierce acknowledges this evidence, he claims the state court's ruling was unreasonable because it premised its findings on a misunderstanding of the drumbeat rule: that a drumbeat-based objection would have rendered the adult witnesses' testimony as to J.W.'s statements *entirely* "inadmissible," as opposed to inadmissible *before J.W.*'s own testimony. According to Pierce, the drumbeat rule permitted the jury to hear J.W.'s out-of-court statements from the adult witnesses—it simply required the jury to hear them after J.W. herself testified and was subject to cross-examination. We cannot, however, review this kind of quarrel with the state court's

application of state law on habeas corpus. *See Powell v. Fuchs*, 4 F.4th 541, 548 (7th Cir. 2021) ("[O]n habeas review we cannot overturn a state-court's conclusions about state law."); *see also Perruquet v. Briley*, 390 F.3d 505, 511–12 (7th Cir. 2004) ("[E]rrors of state law in and of themselves are not cognizable on habeas review."). To the extent the Indiana Court of Appeals may have misapprehended Indiana's drumbeat rule, that mistake provides no grounds for relief under § 2254.

Pierce also argues that the Indiana Court of Appeals ignored evidence that his trial attorney was unaware of the drumbeat rule. At Pierce's post-conviction evidentiary hearing, his counsel questioned trial counsel about her failure to object. The following exchange ensued:

> Q: Okay. So if that was the truth [that J.W. testified fifth], would you have considered an objection to them testifying about, um, J.W.'s statements to them?
>
> A: Well, you know, it's hearsay, but she was on the witness list for them and she would, I would have called her had they not, so in my mind this was going to come in one way or the other, I mean it was saving time in terms of them not having to call rebuttal witnesses and bringing people back to the witness stand. I mean I already knew what they were going to say because I'd, particularly [J.W.'s grandfather and mother], because I had done their depositions. And I'd also talked to [J.W.'s grandfather], uh, a couple of times just in, in interview type situation, informally.

> Q: *Were you aware that you could, that, of the possibility of objecting to that testimony as drumbeat testimony? Are you familiar with that?*
>
> A: *As what, I'm sorry?*
>
> Q: *Drumbeat testimony, the, um, repeating the victim's story over and over again before she testifies. Does that sound like a familiar basis for an objection to you?*
>
> A: *Um, no, that's not one I would have made for this, no.*

This ambiguous exchange does not make the state court's strategic finding unreasonable. Pierce's counsel faced back-to-back questions about her knowledge of the drumbeat rule, and she did not give a square answer to either. Her puzzled response to the first question does not exude familiarity, but neither is it unequivocally unaware. Perhaps, as Pierce argues, his counsel had never heard of the drumbeat rule. But equally plausible is the possibility that she simply did not hear the question. Furthermore, Pierce's counsel's response to the second question provided no greater clarity. She did not say she was unfamiliar with a drumbeat objection. Instead, she said that it was not one she "would have *made*." Given that answer, it is possible she was asserting that she simply chose not to invoke the drumbeat rule in that instance.

The fact that both interpretations are at least plausible precludes us from displacing the state court's factual determination at the habeas stage. *See Wood,* 558 U.S. at 301 ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Given that we cannot

disturb the state court's factual conclusion when "reasonable minds reviewing the record might disagree about the finding in question," the ambiguous testimony here is not enough to overcome AEDPA deference. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015); *see also Powell*, 4 F.4th at 549 (declining to disturb the state court's factual finding where there was "more than one way to interpret" counsel's actions); *Rice*, 546 U.S. at 342 (holding that federal courts may not use "debatable inferences" to set aside a state court's factual conclusion). Without clear and convincing evidence to the contrary, it was not unreasonable for the Indiana Court of Appeals to find that Pierce's counsel's failure to object at trial was strategic.

**B. Section 2254(d)(1)**

We turn next to Pierce's arguments under § 2254(d)(1), in which he contends that the state court unreasonably applied clearly established law in *Strickland* in concluding that his counsel's failure to object at trial was not constitutionally deficient.

A petitioner raising a *Strickland* claim must demonstrate two things. "First, he must show that counsel provided constitutionally deficient performance" and second, he must "show that this deficient performance prejudiced his defense." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (quoting *Winfield*, 956 F.3d at 451–52.) "Failing to prove either element defeats a petitioner's claim." *Id.* (quoting *Winfield*, 956 F.3d at 452). "This inquiry into a lawyer's performance and its effects turns 'on the facts of the particular case,' which must be 'viewed as of the time of counsel's conduct.'" *Laux v. Zatecky*, 890 F.3d 666, 673–74 (7th Cir. 2018) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 371 (1993)).

*Strickland* "calls for a deferential review of an attorney's conduct." *Meyers v. Gomez*, 50 F.4th 628, 643 (7th Cir. 2022). In order to minimize "the distorting effects of hindsight" in assessing counsel's performance, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Counsel's performance is deficient only if the petitioner identifies "acts or omissions … outside the wide range of professionally competent assistance." *Id.* at 690.

The constraints AEDPA imposes on our review of state court decisions adds an additional layer of deference to the already deferential *Strickland* standard. Our task in habeas is not to assess Pierce's *Strickland* claims de novo. Rather, AEDPA confines our inquiry to whether the Indiana Court of Appeals' determination that Pierce was not denied ineffective assistance of counsel "was contrary to, or involved an unreasonable application of" *Strickland*. 28 U.S.C. § 2254(d)(1). "[AEDPA] is a deferential and 'difficult to meet' standard." *Jones v. Cromwell*, 75 F.4th 722, 726 (7th Cir. 2023) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). "A federal court may not issue a writ of habeas corpus 'simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Hough v. Anderson*, 272 F.3d 878, 890 (7th Cir. 2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)). Unreasonable "means more than incorrect." *Winfield*, 956 F.3d at 451. The state court decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Under this "'doubly deferential'" review, the state court's finding that counsel's failure to object was a strategic decision all but forecloses Pierce's argument that the state court unreasonably applied *Strickland*. *Meyers*, 50 F.4th at 643 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). As a constitutional matter, an attorney's strategic decision to forgo lodging a particular objection is difficult to impugn. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). *Strickland*'s performance standard "provides significant latitude for permissible attorney conduct, and a prisoner 'must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Mosley v. Atchison*, 689 F.3d 838, 847–48 (7th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689). We must examine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," *Strickland*, 466 U.S. at 690, and we may grant Pierce relief only if no reasonable argument can be made that counsel's failure to object "was a legitimate strategic decision." *Meyers*, 50 F.4th at 643 (citing *Shannon v. Hepp*, 27 F.4th 1258, 1267 (7th Cir. 2022)).

Of course, *Strickland*'s presumption "applies only if the lawyer actually exercised judgment." *Mosley*, 689 F.3d at 848 (citing *Strickland*, 466 U.S. at 690–91; *Dunn*, 981 F.3d at 591 ("But for this deference to apply, the decision must be—in fact—strategic."). Pierce points out that we have held that if "the only reason counsel failed to object was [her] understanding that such testimony was not objectionable—and not some strategic judgment—counsel runs the risk of rendering performance that falls below the objective standard of reasonableness." *Carter v. Douma*, 796 F.3d 726, 736–37 (7th Cir. 2015)

(quotation marks omitted); *see also Mosley*, 689 F.3d at 848 ("The consequences of inattention rather than reasoned strategic decisions are not entitled to the presumption of reasonableness."). But, given the state court's reasonable finding that Pierce's counsel was familiar with the drumbeat rule, we cannot characterize this as a case in which trial counsel made a basic legal mistake or refrained from objecting due to "ignorance of the law." *Harris v. Thompson*, 698 F.3d 609, 644 (7th Cir. 2012).

Under these circumstances, Pierce's counsel's decision to refrain from objecting to the drumbeat testimony was a reasonable strategic assessment. More precisely—and to put it in the terms of AEDPA—it was not unreasonable for the Indiana Court of Appeals to reach that conclusion. Pierce's counsel's stated trial strategy was to paint J.W. as a liar by highlighting the inconsistencies in her accounts over time. Pursuant to that strategy, trial counsel elicited repeated admissions from the adult witnesses that J.W.'s stories were inconsistent. A competent attorney might well have determined that culminating the trial with J.W.'s testimony rather than beginning with it helpfully enabled the defense to undermine her credibility before she took the stand. We must therefore affirm the district court and deny the writ here because the state court has offered a reasonable argument that counsel behaved competently.[1]

---

[1] Because the state court did not unreasonably apply *Strickland* in concluding that trial counsel was not ineffective, we need not reach the question of prejudice resulting from her purported ineffectiveness.

### III. Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.