In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2786

MICHAEL MEYERS,

*Petitioner-Appellant,*

*v.*

DAVID GOMEZ,

*Respondent-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-05687 — **Charles P. Kocoras**, *Judge.*

ARGUED FEBRUARY 17, 2022 — DECIDED OCTOBER 6, 2022

Before ROVNER, HAMILTON, and ST. EVE, *Circuit Judges.*

ROVNER, *Circuit Judge.* Michael Meyers was one of seven men charged and convicted with the 1989 murders of Dan Williams and Thomas Kaufman in Chicago. He appeals the district court's denial of his habeas corpus petition. He presents two claims: (1) that the Illinois Appellate Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), in rejecting his claim that his trial counsel was ineffective for failing to interview and present the

testimony of an alibi witness; and (2) that his conviction was based on the State's knowing use of perjured testimony in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959), a claim he contends he fairly presented to the state courts but that those courts wrongfully rejected as a factual matter based on a credibility determination he says makes no sense. We affirm.

## I.

In November 1989, Jerry Williams and other members of Chicago's Del-Vikings gang accosted a woman named A.W., struck her in the head with a pistol and beat her, interrogated her about the location of rival Gangster Disciples gang member Kevin Young (with whom A.W. had a relationship), and then raped her.

Two days later, at approximately 10 p.m. on November 9, 1989, a group of seven masked men at the (since demolished) Stateway Gardens public housing complex shot and killed Dan Williams in the apparent and mistaken belief that he was Jerry Williams. Their bullets also struck and killed Thomas Kaufman, a security guard in a nearby building on the Illinois Institute of Technology ("IIT") campus. The seven men charged with the murders—Kevin Young, Meyers, Thomas Carter, James Young, Michael Johnson, Eric Smith, and James Bannister—were all members of the Gangster Disciples gang. Meyers and five of his co-defendants were tried jointly 17 months after the shooting, in March-April 1991.[1]

A.W. testified at the trial that she met with Kevin Young and Carter in an apartment at 3547 South Federal in Stateway

---

[1] The case against defendant Michael Johnson was severed for trial.

Gardens five hours before the shooting and identified to them the men who had assaulted her. Kevin Young and Carter then left the apartment and later returned with three other men: Meyers, James Young, and Johnson. The five men left the apartment around 10 p.m. dressed in black and carrying guns; A.W. stayed behind. The five men returned to the apartment about 20 minutes later, wearing ski masks (in one case, a stocking cap) over their faces. At that time, Kevin Young took all but one of the guns and placed them in a radiator. (James Young took the remaining gun with him.) In her testimony, A.W. admitted that she had lied to the police after the shooting when she told them that she was spending time with a cousin on the night of the shooting and had not seen Kevin Young or any of the other defendants at that time.

The state's key witness at the trial was Deanda Wilson, who was 12 years old at the time of the shooting and 14 by the time of the trial. Wilson socialized with members of the Del-Vikings gang. Wilson said that on the night of the shooting, he and a friend were standing in a hallway on the first floor of the Stateway Gardens building located at 3517-19 South Federal Street, one story above ground level. (His grand-mother lived in that building.) Wilson and his friend were on the 3519 side of the building. He heard people yelling "here come Ace Dog," the street name for Kevin Young. A861.[2] He went outside to the first-floor landing or balcony—or "porch," as the witnesses referred to it—overlooking a playlot and saw a group of seven men dressed in black approaching

---

[2] Citations to "A—" are to the two-volume appendix filed by Meyers, and citations to "SA—" are to the supplemental appendix attached to Meyers' main brief. Citations to "7th Cir. R.—" are to documents found on this court's docket.

from the 3547 South Federal building, where Wilson lived with his mother and brother. Kevin Young was wearing a baseball cap and the other six were wearing knitted or skull caps with their faces exposed. Wilson knew all seven men and recognized them; all were members of the Gangster Disciples. He ran up to the second-floor porch of the building and from there saw that Meyers (whom he knew by the street name "Ice Mike"), Kevin Young, and Carter were now standing at the front of the ground-floor breezeway of the 3517-19 building that separated the two sides of the building. Smith and Bannister were standing directly below Wilson in front of a janitor's closet. James Young and Johnson were standing on a first-floor porch on the 3517 side of the building. Wilson noticed Dan Williams standing to the side of the playlot in front of the building, and he heard someone yell, apparently to Williams, "Come here, motherfucker." A872. Williams responded, "I ain't have nothing to do with it." A872. Someone else yelled, "Didn't I tell your mother fucking ass to come here[?]" A873. Then, according to Wilson, Meyers, Kevin Young, and Carter stepped out of the breezeway, took guns from their coats, and aimed them at Williams; simultaneously, Smith and Bannister stepped forward from the janitor's closet with guns in their hands, also aimed at Williams. Johnson and James Young, who were standing on the first-floor porch, likewise aimed firearms at Williams. All seven men began firing at Williams. Williams ran toward the IIT building across the street and collapsed in between the revolving doors of that building. Kaufman, a guard on duty inside of the IIT building, was also struck and killed by the gunfire. The shooting lasted, by Wilson's estimate, for about 15 seconds. After the gunfire stopped, Wilson saw the defendants jog over to the 3547 building with their guns still in their hands.

On cross-examination, Wilson admitted having told the police that the gunmen, with the exception of Kevin Young, had their caps pulled down over their faces when he saw them. He also admitted telling the grand jury that when he ran up to the second-floor porch, he was unable to see the two men standing on the first-floor porch of the 3517 side of the building.

Denise Brady testified that around 10 p.m. on the night of the shooting, she noticed two men in dark clothing and ski masks standing near an elevator on the first floor of the building at 3517-19 South Federal. She descended to the ground floor, where she heard someone say, "Come here." A502. She turned toward the voice and saw Kevin Young dressed in dark clothing and a baseball cap, but no mask. She also observed Dan Williams, whom she knew, walking by the 3517-19 building. She exchanged greetings with Williams. Then she heard someone say, "Come here, come here, motherfucker." A504. When she turned toward that voice, she again saw Kevin Young, who "came up out of his coat" and began shooting a gun at Williams. A505. She urged Williams to "[r]un." A506. She went on to describe the shooting in terms roughly akin to Wilson's. She saw four other shooters but she could not identify them, in part because some of them had their faces masked.

Wilson's mother Ruth testified that she heard the shooting from the bedroom of her apartment at 3547 South Federal and when she looked out her window, which faced the 3517-19 building, she saw at least five men in dark clothing and hats or hoods walking toward her building. Although she could not see any of their faces, she nonetheless recognized Kevin

Young and Carter as two of the men, and she saw Young put
a gun under his coat.

Finally, Detective Edward Winstead testified that he had
inspected the second-floor porch from which Wilson testified
that he had witnessed the shooting. Winstead said that from
that vantage point, one could not see the first-floor porch on
the 3519 side nor into the ground-floor breezeway where Wil-
son had testified that Meyers, Kevin Young, and Carter were
standing. Similarly, the janitor's closet directly below the
porch was not visible, although according to Winstead, if the
doors to the closet were open, they were visible. Finally, one
could see a limited part of the first-floor porch on the 3517
side of the building.[3] This testimony, as counsel for the de-
fendants were at pains to emphasize, cast doubt on Wilson's
testimony that he could see where each of the defendants was
standing immediately prior to the shooting. But of course,
Wilson had also testified that he saw the defendants as they
approached the 3517-19 building and again (as to those de-
fendants who then took up stations at ground level) when
they stepped forward away from the building and opened fire
on Williams.

Sherri Parker, a neighbor and longtime acquaintance of
Meyers, was subpoenaed by Meyers' trial counsel, George
Nichols, to appear at the trial but ultimately was not called to
the witness stand. Meyers had given Parker's name to Nich-
ols. At the time of the shooting, Parker lived in the Stateway
Gardens complex at 3549 South Federal, about 300 feet away

---

[3] The porches had chain-link fencing in front of them, such that some-
one standing on a porch could not lean outward from the landing in order
to get a better look at what was below or beside him.

from the scene of the murders. She would later submit an affidavit in support of Meyers' post-conviction petition alleging that on the night of the shooting, Meyers came to her apartment at about 9:30 p.m. and left around 10 p.m. Almost immediately after he left her apartment, she heard gunshots. She said that in the short time following his departure, Meyers would not have been able to make it outside of her building and over to the 3517-19 building by the time the shots rang out. According to Parker, neither Nichols nor anyone else from the Public Defender's office had ever interviewed her prior to trial. She responded to the subpoena and showed up at the courthouse, but she was not asked to testify.

All seven defendants, including Meyers, were convicted on two counts of first-degree murder, for both Williams and Kaufman. They were all sentenced to terms of natural life in prison.

Wilson subsequently recanted portions of his trial testimony. He gave a transcribed statement to defendant Eric Smith's counsel in June 1992 in which he averred that he could only positively identify four of the shooters and that he could not be certain about the remaining three, including Meyers, because their caps had partially obscured their faces. Instead, he claimed that the police had shown him photos of each defendant, and because he otherwise knew who they were, he identified them each by name. But he averred that he told the police that he could not identify all seven of the shooters.

In April 1998, Wilson signed an affidavit in defendant James Young's post-conviction proceeding in which he repeated his recantation but now asserted that he could not identify *any* of the shooters other than Kevin Young. Wilson

stated that he "lied at trial because the cops and state's attorneys told me to." A2031.

In April 1995, after Meyers' conviction was affirmed on direct appeal, he filed a pro se petition for post-conviction relief. Among other claims in that petition, Meyers argued that his trial counsel, Nichols, was ineffective for failing to investigate the scene of the shooting and to establish that Wilson would not have been able to see the shooters from his second-floor vantage point.[4] Pointing to Wilson's recantation, Meyers added that he was wrongfully convicted based on Wilson's perjured trial testimony and the prosecution's subornation to commit perjury. Meyers argued:

> The June 10, 1992 Statement is further evidence that makes it clear, that this Petitioner-Defendant was wrongly convicted based upon perjury, [s]ubornation to commit perjury by the State's Attorney, and failure of the trial counsel to present the expert witnesses necessary to demonstrate the impossibility of Deanda [Wilson] to see the things he claimed he saw. If these things had not happened it would have made a substantial difference in the outcome of this Defendant's trial in a favorable way to the Defendant.

A1974. That petition was later supplemented in June 2002 with the aid of counsel. There Meyers argued that he was entitled to a new trial under *People v. Burrows*, 665 N.E.2d 1319,

---

[4] Of course, Detective Winstead's testimony itself established the limits of what Wilson would have been able to see from the second-floor porch.

1328 (Ill. 1996), based on Wilson's post-trial recantation, which he argued was sufficiently reliable to suggest that Wilson's trial testimony was a complete fabrication and that he might be actually innocent of the murders. In that context, Meyers pointed to Wilson's 1992 transcribed statement and his 1998 affidavit acknowledging that he (Wilson) could not positively identify Meyers as one of the shooters. Finally, as relevant here, Meyers also argued that his trial counsel, Nichols, was ineffective in failing to interview and present the alibi testimony of Sherri Parker.

The post-conviction judge (who was also the trial judge) subsequently held an evidentiary hearing in September 2002 for four defendants (Meyers, Bannister, Smith, and James Young) on the matter of Wilson and his allegedly perjurious trial testimony.[5] Wilson testified at that hearing that, contrary to his trial testimony, he had not seen the shooting. He said that he was in another building at Stateway Gardens, not the 3517-19 South Federal building, at the time. He did hear the gunfire, and afterwards he walked over to the scene and learned who had been shot. He later falsely identified the defendants to the police as the shooters based on what he had been told by Del-Viking gang members and neighbors. Wilson said that on his way to the grand jury proceeding, he told Detective Winstead that his prior statements to the police were false, but he said Winstead instructed him to tell the

---

[5] The judge had initially rejected the reliability of Wilson's recantation out of hand and refused to hold a hearing on the matter, but in an unpublished order issued in November 1998, the Illinois Appellate Court reversed that ruling and remanded for an evidentiary hearing. *See People v. Bannister*, 880 N.E.2d 607, 613 (Ill. App. Ct. 2007), *aff'd*, 923 N.E.2d 244, 246 (Ill. 2009) (recounting this procedural history).

grand jury what he had told the police. He also testified that he did not want to testify at trial but based on his pre-trial discussions with an Assistant State's Attorney, he hoped that a drug charge pending against him would go away in exchange for his cooperation. He added that on the day of his trial testimony, the prosecutor told him he could get five years in prison if he refused to testify. Finally, Wilson indicated that he was not truthful in his 1992 transcribed statement when he represented that he could positively identify four of the shooters, and that he was likewise untruthful in his 1998 affidavit, when he said that he could identify Kevin Young as one of the shooters.

Assistant State's Attorney James McKay, the lead prosecutor at trial, also testified at the hearing. He recalled speaking with Wilson on two occasions prior to trial, and on neither occasion had Wilson indicated he was reluctant to testify against the defendants. McKay denied making any promises to Wilson regarding his drug charge or threatening him with prison if he did not testify.

Detective Winstead, who had accompanied Wilson to the grand jury, testified that Wilson never said that his prior statements to the police were lies.

Ruth Wilson testified that on the night of the murders, her son told her that he witnessed the shooting and named six or seven of the shooters. She confirmed Winstead's testimony that when Wilson was en route to testify before the grand jury, he did not say that he was unable to identify the shooters or that his prior statements to the police were false. Nor had Winstead threatened her son with incarceration if he did not cooperate. Her son had told her that he wanted to testify at trial for the victim (presumably Williams).

Finally, among other witnesses at the postconviction hearing, Denise Brady testified that she had not spoken with Wilson on the night of the shooting nor had she given him information regarding the shooters in order to create a story that he could tell to the police.

In January 2004, having considered the evidence presented at the hearing, the judge granted relief as to Smith and Bannister based on Wilson's recantation but denied it as to Meyers and James Young. The judge reasoned that Smith and Bannister were not among the five armed defendants whom A.W. had seen leaving the apartment just before the shooting and returning 20 minutes later. To that extent, A.W. had not corroborated Wilson's trial testimony identifying Smith and Bannister as being among the seven shooters. So as to those two defendants, the judge found that Wilson's trial testimony "was not accurate and truthful and that the outcome of this case as to Smith and Bannister would probably have been different if not for Wilson's perjured testimony." SA3. He therefore vacated their convictions.[6] But as to Meyers and James

---

[6] Smith and Bannister were subsequently re-tried to the bench. Their co-defendant, Michael Johnson, testified against them at that trial. Wilson was called as a witness, but consistent with his testimony at the postconviction hearing, he denied having seen the shooting. His testimony at the original trial was introduced as a prior inconsistent statement. The judge convicted both Smith and Bannister and they were again sentenced to life terms in prison. *See Bannister*, *supra* n.5, 880 N.E.2d 614–16 (describing evidence presented at second trial and outcome). Bannister argued on appeal of his second conviction that the re-trial violated his double jeopardy rights, but the Illinois Appellate Court rejected this argument. The court reasoned in part that Bannister had forfeited the contention by affirmatively seeking a new trial during the post-conviction process. *Id.* at 617. In the alternative, the court rejected the argument on its merits. Although double jeopardy precludes a second or successive trial when the evidence

Young, the judge reached the opposite conclusion. "I believe that so far as these two defendant petitioners are concerned, Deanda Wilson was not lying, was telling the truth, and importantly[,] most importantly[,] I find that the testimony of A.W. provided substantial important confirmation corroborati[ng] …. Wilson's testimony. … I believed A.W.'s testimony, [and that] corroboration was most important in my mind. …. [R]ecantations are … inherently unreliable." SA11 (citations and internal quotation marks omitted). *See also* SA18 (Dec. 21, 2005) (reiterating this finding as to Meyers).

Although the judge thus resolved on the merits Meyers' claim for relief based on Wilson's recantation, he declined to hold a hearing on Meyer's ineffective assistance claim regarding the alibi and dismissed that claim.

Wilson appealed the adverse rulings on his two claims and in February 2008, the Illinois Appellate Court, in an unpublished order, sustained the denial of Meyers' claim as to Wilson's recantation but reversed the dismissal of his ineffectiveness claim. SA23.

As to the recantation, the court noted that recantations are regarded as inherently unreliable and will not support a new

---

presented at the defendant's first trial was legally insufficient to convict, the court explained, it does not preclude a retrial when the defendant's conviction has been set aside because of an error in the proceedings culminating in the defendant's original conviction. *Id.* In this case, Bannister's conviction was vacated and he was granted a new trial in view of Wilson's subsequent recantation of his trial testimony, not because of any shortcoming in the State's proof of Bannister's guilt. Indeed, the court expressly found that the evidence presented at the first trial was sufficient to support Bannister's conviction. "Accordingly, the defendant's second prosecution did not violate his right to be free from double jeopardy." *Id.* at 618.

trial except in extraordinary circumstances. In this case, Wilson had given three different versions of his recantation, each of which conflicted with the other, and had not explained the inconsistencies. The postconviction judge had observed Wilson's testimony at both the trial and the post-conviction hearing and was aware of the trial testimony of the other witnesses, including that of A.W., Ruth Wilson, and Denise Brady, whose accounts were consistent with Wilson's trial testimony. The judge had specifically found Wilson's trial testimony implicating Meyers to be credible and his recantation to be incredible. The judge had emphasized that Wilson's trial testimony as to Meyers was substantially corroborated by A.W.'s testimony. "Based on our examination of the record, we cannot say that the circuit court's credibility determination and its rejection of Wilson's recantation was manifestly erroneous." SA34.

As to the ineffectiveness claim, however, the appellate court reasoned that Meyers was entitled to an evidentiary hearing. Accepting as true the allegations of Meyers' postconviction claim and Parker's affidavit as to what she would have testified, the court agreed that Parker would have supported the theory that Meyers was not present at the scene of the shooting or the apartment where A.W. encountered five of the shooters prior to and after the shooting. The court also reasoned that trial counsel's decision not to call Parker could not be deemed a legitimate strategic decision because, again accepting Parker's affidavit as true, Nichols had never interviewed her and did not know the substance of her potential testimony. Furthermore, because Parker's testimony would have directly contradicted that of A.W., whose corroboration of Wilson's trial testimony the postconviction judge had deemed so crucial, the court was not prepared to say as a

matter of law that the outcome of the trial likely would not have been different had Parker testified. The court cautioned that its decision was not to be interpreted as a comment on Parker's credibility as a witness, which was up to the circuit court to assess. SA38–39.

In March of 2014, nearly 25 years after the murders, the trial court finally held a hearing on the ineffectiveness claim.[7] A new judge conducted the hearing. By that time, Nichols, Meyers' trial counsel, had died.

Meyers testified that Parker was a family friend and that he was at her apartment in the 3549 South Federal building on the night of the shooting. He had left her apartment 10 to 15 seconds before the shooting and was still in the hallway outside of her apartment when he heard the shots. He said he gave Parker's name and contact information to Nichols after his arrest, along with the nature of the alibi, but Nichols told him that he didn't feel safe going to Stateway Gardens alone to talk to Parker, and Meyers was unable to think of someone who could accompany Nichols. On the day of trial, Nichols advised Meyers that Parker was present at the courthouse but that he didn't plan to call her to the witness stand. He didn't tell Meyers why. On cross-examination, Meyers denied

---

[7] On remand, the circuit court had initially dismissed the ineffectiveness claim for a second time after Meyers' appointed counsel filed a motion to withdraw upon finding (as we discuss below) notes of a 1990 interview with Parker among Nichols' trial papers. In 2012, the Illinois Appellate Court initially sustained the dismissal and the lower court's order allowing Meyers' appointed counsel to withdraw, but on rehearing changed course, reversed both decisions, and remanded for an evidentiary hearing. *See People v. Meyers*, 65 N.E.3d 961, 964 (Ill. App. Ct. 2016) (recounting this history).

telling Detective Winstead, who interviewed him following his arrest, anything other than that he knew nothing about the shooting. Meyers also admitted that he did not tell Winstead he was with Parker at the time.

Parker testified similarly to Meyers about the night of the shooting, i.e., he was at her apartment and was in the process of leaving when they heard the shots. She said she received a subpoena to appear at trial but did not meet with Nichols prior to trial and did not believe that anyone working with Nichols had ever spoken to her in advance of the trial. When an investigator spoke to her in 2009, she told the investigator she thought she and Meyers heard the shots at about 3 p.m. but that she could not recall the precise time of the shooting. And when Meyers' postconviction counsel, Timothy Leeming, spoke to her in 2010, she repeated to him that she could not recall the time of the shooting. Parker also acknowledged, at first, that someone had come to her apartment and talked to her prior to the trial, but she denied that it could have been Nichols because "[i]t wasn't a man in a suit." A2173. Then Parker retreated and said she did not recall whether anyone had spoken to her in advance of the trial.

Detective Winstead, by then retired, testified that when he interrogated Meyers after his arrest, Meyers told Winstead that on the night of the shooting he had gone to the 3519 side of the building at 3517-19 South Federal in order to purchase marijuana from a man named Randy. Meyers said that he saw Kevin Young, Carter, Bannister, Smith, and James Young there, and he also saw Williams walking by. Meyers heard both the verbal exchange between the shooters and Williams and the gunfire that followed, but he denied any involvement in the shooting. Winstead said he was later joined in the

interrogation by Assistant State's Attorney Jerry Marconi, to whom Meyers repeated this account. Meyers did not tell Marconi that he was at Sherri Parker's apartment at 3549 South Federal. (The parties stipulated that Marconi would testify consistently with Winstead's account.)

Assistant Public Defender Leeming testified that he was assigned to work on Meyer's post-conviction proceeding in 2009. At that time, among some 20 pages of handwritten notes in Nichols' file, he discovered what looked like one or two pages of notes from an interview of Parker in March 1990, one year before the trial took place. Leeming had no idea who took the notes. According to the Illinois Appellate Court, those notes contained no reference to Parker having been with Meyers at the time of the shooting. *People v. Meyers*, 65 N.E.3d 961, 965 (Ill. App. Ct. 2016). When Leeming and a law student intern interviewed Nichols in 2010, Nichols remembered the case only slightly, and he did not recall anything about Parker.

Investigator Daniel Brannigan of the Cook County State's Attorney's office testified that he interviewed Parker in 2009 and again in 2013. Both times Parker told him that she and Meyers were at her apartment at the time of the shooting. In 2009, Parker said this was at about 3 p.m., but in 2013, she said that it was around 7 p.m. and that she and Meyers were "probably getting high together" in her apartment. A2241. Parker had also volunteered in the second of these interviews that she was a regular user of heroin and cocaine in 1989, the year the shooting took place.

Following the hearing, the postconviction judge resolved the merits of the ineffectiveness claim against Meyers. The judge noted first that although Meyers denied telling anyone

that he was at the scene of the shooting, the record also reflected that he had sought to suppress his post-arrest statements to that effect.[8] The judge went on to note that Parker was present in court at trial and that Nichols told Meyers he would not call her to the witness stand, from which the judge inferred that Nichols "at least knew who Sherr[i] Parker was … ." SA44. The record also reflected that Parker was disclosed as a prospective witness and had been subpoenaed to appear at the trial. Parker's alibi testimony posed a problem for the defense, however, in that it would have opened the door for

---

[8] The record indicates that the trial court denied Meyers' motions to suppress his post-arrest statements as well as his motion *in limine* to specifically exclude his statement that he had gone to the 3517-19 building in order to buy marijuana. The court was prepared to allow Detective Winstead to recount Meyers' statements in redacted form (eliminating any reference to him seeing his co-defendants at the 3517-19 building), so as to disclose Meyers' acknowledgment that he was present at the scene of the shooting, that he was there to purchase marijuana, that he saw Williams walking by, that he saw Williams being shot at but did not himself shoot at anyone, and that after the shooting, he walked over to 3549 South Federal. A1342. But counsel for Meyers' co-defendants renewed their objections under *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620 (1968), to the admission of Meyers' statements because, in their view, those statements, even as redacted, necessarily inculpated his co-defendants, and yet given that Meyers was being tried jointly with them, Meyers, unless he elected to take the witness stand, could not be cross-examined on his statements. A1331–41. At the same time, counsel for Meyers argued that if the court was going to allow any portion of his client's statements into evidence, it should admit the entirety of those statements. A1333–35, 1342–43. In view of the various objections, the State elected to unilaterally withdraw its request to admit the statements and they were never introduced at trial. A1345–46. Had Parker testified, however, the State presumably would have elicited Meyers' statements placing him at the scene of the shooting given the court's stated willingness to allow them into evidence in redacted form.

the State to elicit testimony regarding Meyers' contrary post-arrest statements acknowledging that he was present at the 3517-19 building when the victims were shot. Admission of those statements in turn would have bolstered the credibility of the eyewitness testimony likewise placing Meyers at the scene. The judge therefore found that "George Nichols was aware of Sherr[i] Parker and as a matter of trial strategy decided not to call her." SA50. The judge did not make any finding as to whether Parker was credible (although he did find that Parker had been impeached in various respects) or whether Nichols had ever interviewed her.

Meyers appealed for a final time, but the appellate court affirmed the postconviction judge's ruling. *Meyers*, 65 N.E.3d 961. The court sustained the post-conviction judge's determination that Nichols' decision not to call Parker as a witness was a matter of trial strategy, finding that the evidence supported that determination even assuming, as Meyers contended, that Nichols never interviewed her. The appellate court reasoned: (1) there was no question that Nichols was aware of Parker, in that Meyers had identified her to Nichols, she was disclosed as a potential witness in discovery, and she was subpoenaed to testify; (2) although Parker was present in court, Nichols decided not to call her and told his client as much, signaling that he made a strategic decision not to present her testimony; (3) that decision was reasonable, given that the State could have presented rebuttal testimony from Detective Winstead and Assistant State's Attorney Marconi recounting Meyers' post-arrest statements to them admitting that he was at the scene of the shooting when the murders took place, not at Parker's apartment; (4) Nichols was obviously aware of those post-arrest statements, because he had not only moved in advance of trial to suppress them, but had

also filed a motion *in limine* specifically seeking to bar the State from eliciting the portion of those statements regarding Meyers' intent to buy marijuana. *Id.* at 967–68. For these reasons, the appellate court concluded that Nichols did not deprive Meyers of the effective assistance of counsel. *Id.* at 968, 969. It did not reach the question of whether Meyers was prejudiced by his counsel's failure to look into and present Parker's testimony.

Meyers then filed his habeas petition in federal court, but Judge Kocoras denied the petition. *Meyers v. Pfister*, No. 17 C 5687, 2020 WL 4704764 (N.D. Ill. Aug. 13, 2020). First, as to the claim of ineffectiveness, he held it was not unreasonable for the state court to find that Nichols made a legitimate strategic decision not to call Parker as an alibi witness, as this would have opened the door to testimony regarding Meyers' post-arrest statements admitting that he was present at the scene of the shooting. Judge Kocoras also held in the alternative that Meyers had failed to establish that he was prejudiced by Nichols' decision not to call Parker. He did not think there was a reasonable probability that Parker might have changed the outcome of the trial, given A.W.'s testimony that Meyers was among the five men she saw armed and dressed in dark clothing immediately before the shooting and Wilson's testimony identifying Meyers as one of the shooters. *Id.*, at *5.

As for the claim regarding the knowing use of perjured testimony at the trial, Judge Kocoras found that Meyers had procedurally defaulted this claim. He agreed with the State that Meyers had not presented such a claim to the state courts, but instead had solely pursued a claim of actual innocence based on Wilson's recantation. Meyers had not shown cause for this procedural default nor resulting prejudice. Nor could

he establish that it would be a fundamental miscarriage of justice not to reach the merits of the perjury claim. In the judge's view, any doubts raised by Wilson's recantation were resolved by the fact that A.W. had identified Meyers as one of the shooters and Meyers' own co-defendant, Johnson, who testified at Bannister's re-trial, *see* n.6, *supra,* also implicated Meyers in the shooting. *Id.*, at \*9.

## II.

The Antiterrorism and Effective Death Penalty Act ("AEDPA") authorizes relief under 28 U.S.C. § 2254 only when the state court's decision on the merits of the petitioner's claim is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). A state court decision is "contrary to" Supreme Court precedent if it either did not apply the proper legal rule or if the decision did apply the correct rule but reached the opposite result from the Supreme Court on materially indistinguishable facts. *E.g., Warren v. Baenen*, 712 F.3d 1090, 1096 (7th Cir. 2013). A state court decision amounts to an unreasonable application of Supreme Court precedent when it applies that precedent in a manner that is "objectively unreasonable, not merely wrong." *Woods v. Donald*, 575 U.S. 312, 316, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419, 134 S. Ct. 1697, 1702 (2014)); *Renico v. Lett*, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862 (2010). By design, this is a difficult standard to meet. *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376. A state court's application of Supreme Court precedent is not objectively unreasonable simply because we might disagree with that application, but rather only when no reasonable jurist could agree with it. *Davis v. Ayala*, 576 U.S. 257, 269–70, 135 S. Ct. 2187,

2199 (2015); *Donald*, 575 U.S. at 316, 135 S. Ct. at 1376; *Williams v. Taylor*, 529 U.S. 362, 409–11, 120 S. Ct. 1495, 1521–22 (2000).

To the extent that a petitioner challenges a factual finding on which the state court's adverse ruling rests, he must show that the finding was unreasonable in light of the evidence presented in the state court proceeding. § 2254(d)(2). We presume that the state court's factual determinations were correct, and the petitioner bears the burden of rebutting that presumption with clear and convincing evidence. § 2254(e)(1); *Shannon v. Hepp*, 27 F.4th 1258, 1268 (7th Cir. 2022), *cert. denied*, 2022 WL 4653051 (U.S. Oct. 3, 2022).

A. Ineffective assistance of counsel for failing to present Parker's alibi testimony

*Strickland v. Washington*, *supra*, 466 U.S. 668, 104 S. Ct. 2052, is the governing precedent vis-à-vis Meyers' attorney-ineffectiveness claim. In order to prevail on that claim, *Strickland* requires Meyers to show that his trial counsel's performance was deficient, *i.e.*, that it fell below an objective standard of reasonableness. *Id.* at 687–88, 104 S. Ct. at 2064. A wide range of attorney performance will satisfy the Sixth Amendment's guarantee of effective representation, *id.* at 689, 104 S. Ct. at 2065, and our review begins with a "strong presumption" that the work of petitioner's counsel fell within that range, *id.*, 104 S. Ct. at 2065; *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S. Ct. 2574, 2586 (1986). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065. Judicial review of an attorney's performance must therefore be "highly deferential." *Id.* at 689, 691, 104 S. Ct. at 2065, 2066.

A fair assessment of attorney performance re-
quires that every effort be made to eliminate the
distorting effects of hindsight, to reconstruct the
circumstances of counsel's challenged conduct,
and to evaluate the conduct from counsel's per-
spective at the time. Because of the difficulties
inherent in making the evaluation, a court must
indulge a strong presumption that counsel's
conduct falls within the wide range of reasona-
ble professional assistance; that is, the defend-
ant must overcome the presumption that, under
the circumstances, the challenged action "might
be considered sound trial strategy." *See Michel
v. Louisiana*, [350 U.S. 91, 101, 76 S. Ct. 158, 164
(1955)].

*Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.

One aspect of an attorney's obligation to his criminally-
charged client is to look into the facts of the case and to assess
potential defenses.

The duty to investigate derives from counsel's
basic function, which is "'to make the adversar-
ial testing process work in the particular case.'"
*Kimmelman v. Morrison*, 477 U.S. 365, 384, 106
S. Ct. 2574[, 2588] (1986) (quoting *Strickland*, 466
U.S. at 690, 104 S. Ct. 2052[, 2066]). "Because that
testing process will not function properly unless
defense counsel has done some investigation
into the prosecution's case and into various de-
fense strategies, [the Supreme Court has] noted
that 'counsel has a duty to make reasonable in-
vestigations or to make a reasonable decision

> that makes particular investigations unneces-
> sary.'" *Id.* (quoting *Strickland*, 466 U.S. at 691,
> 104 S. Ct. 2052[, 2066].

*Brown v. Sternes*, 304 F.3d 677, 691 (7th Cir. 2002). When an attorney has looked into a potential defense witness and yet has made a deliberate decision not to present that individual's testimony, then his decision is likely a strategic decision that warrants the greatest degree of deference from a court. *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005); *see Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). But an outright failure to investigate a potential witness is "more likely to be a sign of deficient performance," *Best*, 426 F.3d at 945, because without interviewing a witness and determining what precisely she would say on the stand, an attorney cannot assess the witness's strengths and vulnerabilities and make a reasonable professional judgment about the likely impact of the witness's testimony, *see Blackmon v. Williams*, 823 F.3d 1088, 1104–05 (7th Cir. 2016).

Meyers contends that the Illinois Appellate Court unreasonably applied *Strickland* in holding that Nichols did not deprive him of the effective assistance of counsel when he failed to have Parker testify on his behalf. In particular, Meyers takes issue with the notion that Nichols could have made a legitimate strategic decision not to call Parker as a witness without ever having interviewed her.

Note that there is a threshold, factual question as to whether Parker *was* interviewed prior to the trial either by Nichols or someone on his behalf. Recall that Assistant Public Defender Leeming said that he discovered a page or two of

notes in the case file from an interview with Parker in 1990. The State urges us to find, based on the existence of those notes and the other evidence that Parker was interviewed, that Nichols was aware of what she had to say, and that he thus made an informed, strategic decision not to call her as a witness.

But we shall give Meyers the benefit of the doubt on this point and assume that the defense did not speak to Parker prior to trial. The notes themselves are silent as to who took them, and the state courts never made a finding that Nichols (or someone on his behalf) actually interviewed Parker. And Nichols himself could not recall anything about Parker when he was questioned in 2010.[9]

Nevertheless, as the Illinois Appellate Court observed, Nichols was clearly aware of Parker prior to and at the time of the trial. Meyers testified that he identified her as a prospective witness to Nichols, she was disclosed as such in discovery, and there is no dispute that she was subpoenaed to appear at trial. Nichols, by Meyers' own account, told Meyers that Parker was present at the courthouse but that he was not going to call her. So Nichols obviously considered the possibility of calling Parker as a defense witness but decided not to, for reasons that Meyers says Nichols did not disclose.

---

[9] For what it is worth, the law student's notes regarding the interview with Nichols, which were not admitted into evidence, appear to indicate that Nichols told Leeming that with the exception of Meyers' mother, who did testify at trial, "no other possible witnesses [were] interviewed." A2062.

Certainly, there are decisions of this court—Meyers has cited a number of them—holding on the facts presented that an accused's trial counsel could not make a legitimate strategic decision not to pursue the testimony of a particular witness without first speaking to the witness and finding out what she has to say. *See Blackmon*, 823 F.3d at 1104–05; *Hampton v. Leibach*, 347 F.3d 219, 251–52 (7th Cir. 2003); *Washington v. Smith*, 219 F.3d 620, 631–32 (7th Cir. 2000); *Montgomery v. Petersen*, 846 F.2d 407, 412–14 (7th Cir. 1988); *Crisp v. Duckworth*, 743 F.2d 580, 584 (7th Cir. 1984). These holdings reflect the commonsense proposition that a lawyer cannot assess the value of a witness's prospective testimony without learning what she knows, what her testimony would be, the plausibility of that testimony, and how the witness would present herself on the stand. *E.g.*, *Blackmon*, 823 F.3d at 1104–05. Given our assumption that neither Nichols nor anyone on his behalf ever interviewed Parker, Nichols would have known only what his client told him about the alibi Parker could offer, and for present purposes we can accept Meyers' contention that this limited knowledge was insufficient to fully evaluate Parker's value as a witness: what specifically she would say on the witness stand, how credibly she would testify, how she might hold up on cross-examination, how the jury might perceive her, and so forth. *See id.*; *Hampton*, 347 F.3d at 252 (citing *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999)).

On the specific facts of this case, however, we do not think that the limits of Nichols' knowledge vis-à-vis Parker precludes a finding that he made a reasonable, strategic decision not to call Parker as a witness. That is what the Illinois Appellate Court concluded on applying *Strickland*, and our role is limited to evaluating the reasonableness of that conclusion. § 2254(d)(1). *Strickland*, as we have said, calls for a deferential

review of an attorney's conduct, and given the constraints that the AEDPA imposes on our review of the state court's decision in this regard, our application of *Strickland* here is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420 (2009). Only if no reasonable argument can be made that Nichols' decision not to call Parker as a witness was a legitimate strategic decision under *Strickland* could we grant Meyers relief. *See Shannon*, 27 F.4th at 1267, 1268 (citing *Harrington v. Richter*, 562 U.S. 86, 105, 131 S. Ct. 770, 788 (2011)). *Strickland* also states that a defendants' counsel must engage in a reasonable investigation *or* make a reasonable decision that a particular investigation is unnecessary. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. Whether a decision not to investigate is reasonable must be assessed on the totality of the circumstances. *Ibid.*

Meyers testified that he told Nichols he was with Parker at the time of the shooting, and so Nichols understood the gist of what Parker had to say. True, Nichols hadn't spoken with Parker and sized her up as a potential witness, but he knew that she would provide an alibi, and it was a relatively straightforward, uncomplicated alibi.

But as the state appellate court pointed out, Nichols also knew that, according to the State, his client had given post-arrest statements which not only omitted the alibi but, in direct contradiction to that alibi, admitted his presence at the scene of the shooting. Meyers would later deny the substance of those statements (and evidently no written record was made of the statements at the time they were given), but Nichols had moved to suppress them and had also moved *in limine* to exclude Meyers' alleged statement to the police that he was present at the scene looking to buy marijuana. Those motions

were not successful, and the trial court was prepared to allow Detective Winstead to recount these statements in redacted form to the jury, but ultimately the statements had not come into evidence at trial only because the State had withdrawn its request to admit the statements. *See* n.8, *supra*. But had Parker testified and presented Meyers' alibi, there can be little doubt that the State would have introduced Meyers' statements, which the trial court had already signaled it was prepared to admit into evidence.

Even if we were to credit Meyers' averment that the police fabricated his post-trial statements, Nichols knew that Parker's alibi testimony would open the door to testimony from both Winstead and Assistant State's Attorney Marconi that Meyers had confessed to them his presence at the scene of the shooting. This in turn presented the substantial risk that Meyers' alleged out-of-court statements might bolster the credibility of Wilson's inculpatory testimony at trial—and A.W.'s for that matter—that Meyers was not only present at the scene of the murders but was a participant in the crimes. Avoiding that risk is a *classic* strategic judgment. Given that Nichols was aware of the gist of Parker's alibi testimony through Meyers and he knew what risk her prospective testimony presented to the defense, the fact that he had not interviewed her is not dispositive of the ineffectiveness claim. Nichols knew enough to make a sound strategic assessment. Or, put in the terms of the AEDPA, it was not unreasonable for the Illinois Appellate Court to so conclude. *Cf. Gilbreath v. Winkleski*, 21 F.4th 965, 985–86 (7th Cir. 2021) ("We cannot say that [counsel's] decision not to investigate [victim's cousin] further in light of what he already knew and in the context of his general strategy was objectively unreasonable. Nor can we say that the

state court unreasonably applied *Strickland* in refusing to fault [counsel] for this choice.").

Meyers contends, however, that it is inappropriate to credit Nichols with this strategic judgment given that, by the time an evidentiary hearing was conducted as to the ineffectiveness claim, Nichols had died and therefore could not be examined as to why he did not present Parker as a witness. He has, once again, cited precedents from this court indicating that it is improper to attribute a strategic rationale to counsel that counsel himself has not articulated. *See Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990) ("Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should not construct strategic defenses which counsel does not offer."), *quoted by Davis v. Lambert*, 388 F.3d 1052, 1064 (7th Cir. 2004).[10] But, of course, a court starts the *Strickland* analysis with the strong presumption that counsel was *not* ineffective, *Kimmelman*, 477 U.S. at 381, 106 S. Ct. at 2586; *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065, and when addressing the particular conduct for which his convicted client has faulted him, further presumes "that, under the circumstances, the challenged action might be considered sound trial strategy," *id.*, 104 S. Ct. at 2065 (cleaned up). For us to presuppose, when counsel is unavailable to explain his decision-making, that he had no strategic rationale for the particular choice at issue—when a choice clearly was made—would turn these presumptions on their head.

---

[10] We point out that our decision in *Harris* pre-dates the AEDPA, and in *Davis*, the state courts had summarily dismissed the petitioner's ineffectiveness claim without a hearing, leaving us without an application of *Strickland* by the state courts to a developed set of facts (leading us to remand the case to the district court to conduct such a hearing).

Furthermore, what we examine under the AEDPA is a state court's application of clearly established law as determined by the Supreme Court. § 2254(d)(1). *See Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) ("It is not enough that the state-court decision offends lower court precedents.") (citing *Glebe v. Frost*, 574 U.S. 21, 24, 135 S. Ct. 429, 431 (2014) (per curiam)). The Supreme Court has admonished that "courts may not indulge in '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions," *Richter*, 562 U.S. at 109, 131 S. Ct. at 790 (quoting *Wiggins v. Smith*, 539 U.S. 510, 526–27, 123 S. Ct. 2527, 2538 (2003)), but it has also rejected the notion that "counsel [must] confirm every aspect of the strategic basis for his or her actions," *ibid.* "*Strickland* … calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* at 110, 131 S. Ct. at 790.

The Illinois Appellate Court did not fabricate from whole cloth the strategic rationale for rejecting Parker as a witness. Not only was Nichols obviously aware of Parker as a potential witness—he subpoenaed her—but he had previously engaged in motions practice with the indisputable aim of keeping Meyers' post-trial statements out of evidence at trial. So although the state court did not have the benefit of Nichols' testimony, neither was it engaging in wholesale conjecture: Nichols' own actions reflect that, on the one hand, he affirmatively considered presenting Parker's testimony (and had her summoned to the courthouse in order to preserve the alibi option until the last moment), and on the other hand, that he was concerned about the potential impact of Meyers' contrary post-arrest statements, which he had taken steps to exclude from evidence at trial. We do not have Nichols' testimony linking the two, but the risk that the defense would be taking

by pursuing the alibi through Parker is obvious from the record. It was not an unreasonable application of *Strickland* for the Illinois Appellate Court to conclude that Nichols had a legitimate strategic reason for keeping Parker off the witness stand.

Because the state court did not unreasonably apply *Strickland* in concluding that Nichols was not ineffective, we need not reach the question of any prejudice resulting from his purported ineffectiveness.

## B.  State's knowing use of perjured testimony (Wilson)

The Supreme Court's decision in *Napue v. Illinois*, *supra*, 360 U.S. at 269, 79 S. Ct. at 1177, holds that a State's knowing use of perjured testimony to secure a defendant's conviction violates his right to due process under the Fourteenth Amendment. Meyers argues that Wilson's recantation demonstrates that the State knowingly used false testimony to convict him.

There is a serious question whether, as the State argues, Meyers procedurally defaulted the *Napue* claim by not presenting it as such at each level of review in the Illinois courts. In order to preserve a federal claim for review in a habeas proceeding, a petitioner must first present it to the state courts through one full round of review, alerting those courts as to the federal nature of the claim when he does so. *Brown v. Eplett*, No. 21-1515, 48 F.4th 543, 552 (7th Cir. 2022), (collecting cases). There is no dispute that Meyers invoked Wilson's recantation in state court to argue that he was wrongly convicted, but whether he presented the claim as a federal *Napue* claim as opposed to a claim for relief under Illinois law is far less clear. Illinois law recognizes a freestanding claim of

actual innocence, *see People v. Washington*, 665 N.E.2d 1330, 1336–37 (Ill. 1996); *People v. Griffin*, — N.E.3d —, 2022 WL 965410, at *4 (Ill. App. Ct. Mar. 31, 2022), *appeal allowed*, 2022 WL 4981463 (Ill. Sep. 28, 2022), which, as relevant here, does not require proof that the prosecution knowingly presented perjured testimony from a witness who has since recanted.[11] Without question, Meyers and other defendants pursued claims of actual innocence in state court. But on the record the parties have put before us, it does not appear that Meyers fairly presented a *Napue* claim to the state courts.

The indications that he did not begin at the circuit court level. Although Meyers made reference to Wilson's perjury and the State's alleged subornation of that perjury in his original, pro se petition for postconviction relief, A1973–74, he did so in the context of asserting that his trial counsel was ineffective in failing to adequately investigate the scene of the shooting and to establish (with expert testimony if necessary) that Wilson's purported ability to see and identify the shooters was fabricated. *See Malone v. Walls*, 538 F.3d 744, 755 (7th Cir. 2008), distinguishing *Lewis v. Sternes*, 390 F.3d 1019, 1026 (7th Cir. 2004). When he later filed a supplemental petition through counsel, he reiterated that Wilson's testimony "was a complete lie" (A1994), and he referred to that testimony as having been "bought" by the police and the prosecutors

---

[11] As the Illinois Supreme Court noted in *Washington*, "Procedurally, such [actual innocence] claims should be resolved as any other brought under the [Post-Conviction Hearing] Act. Substantively, relief has been held to require that the supporting evidence be new, material, noncumulative and, most importantly, of such conclusive character as would probably change the result on retrial." 665 N.E.2d at 1337 (cleaned up).

(A1992–93), but he made these representations in support of an actual innocence claim. A1994–97.

At the appellate level, moreover, there are strong indications that Meyers presented his claim solely as one of actual innocence under Illinois law rather than one premised on the State's knowing presentation of perjured testimony in violation of *Napue*. The Illinois Appellate Court's opinion itself addressed the claim as one of actual innocence only. SA32–34. Unfortunately, the primary briefing in the appeal is not part of the record and the parties have been unable to otherwise track it down; we have only Meyers' reply brief, which he attached to his petition for leave to appeal to the Illinois Supreme Court. The reply brief addresses the veracity of Wilson's recantation at some length but sheds no light on the particular legal claim or claims that Meyers was making based on the recantation. On the other hand, after his counsel filed the opening brief in the appeal, Meyers sought leave to file a supplemental pro se brief which expressly raised a *Napue* due process claim. But the appellate court rejected the pro se brief in view of the fact that Meyers was represented by counsel. After the court issued its merits decision resolving the appeal, Meyers discharged his counsel, and the court allowed Meyers to file a pro se petition for rehearing, to which he attached the supplemental brief that the court had previously rejected. (He later did the same when petitioning for leave to appeal to the state supreme court.) The petition for rehearing itself expressly acknowledges that the claims raised in his pro se supplemental brief were (with one exception) *not* ones pursued by his appointed counsel in the primary briefing. 7th Cir. R. 61-2 at 7 (asking court to grant rehearing, rescind its prior order denying him leave to file his supplemental pro se brief, and to consider the claims raised therein), 11 ("Petitioner

brings to the court[']s attention that Mr. Bennett [his former counsel] has not raised the above stated errors … ."), 12 ("Mr. Bennett … [h]as not raised any of the claims in petitioner's pro se[ ] petition, and only one of the claims the petitioner intended [to] file in a supplemental brief, which [claim] was reversed and remanded ([i]neffective assistance of trial counsel)[.]").

There can be little doubt, then, that counsel's own appellate briefing omitted a *Napue* claim. That being the case, raising such a claim for the first time in a petition for rehearing, as Meyers was attempting to do, would be too late to preserve the claim. *See* Ill. Sup. Ct. R. 341(h)(7); *Lewis*, 390 F.3d at 1031; *Cruz v. Warden of Dwight Correctional Ctr.*, 907 F.2d 665, 669 (7th Cir. 1990). We agree with the district court that Meyers procedurally defaulted the *Napue* due process claim.

Lest there be any doubt on this score, we do not rest our decision on the fair presentment ground alone. On the merits of the *Napue* claim, we see another problem that forecloses relief to Meyers.

In order to prevail on a *Napue* claim, Meyers would have to show in the first instance that Wilson perjured himself when he identified Meyers as one of the shooters. *See, e.g.*, *United States v. Coleman*, 914 F.3d 508, 512 (7th Cir. 2019). Recall that the first postconviction judge did not credit Wilson's recantation as to Meyers—although he did credit the recantation as to his co-defendants Smith and Bannister—and the Illinois Appellate Court affirmed that credibility assessment, so Meyers' first hurdle would be to show that the appellate court's decision on this point was unreasonable. Meyers has briefed this point extensively, which comes as no surprise given the awkwardly-articulated and seemingly self-

contradictory finding that Wilson's recantation was credible as to Smith and Bannister but not as to Meyers. But we may set that issue aside.

Even assuming that Wilson's recantation was credible, and that he perjured himself at trial, Meyers must also show that the State *knew* (or should have known) that Wilson was lying and nonetheless chose to present his false testimony at trial. *See United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019); *Coleman*, 914 F.3d at 512; *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995). And as the State points out, although the postconviction judge credited Wilson's recantation as to Smith and Bannister and agreed that Wilson gave false testimony against them at trial, he also *specifically* found that the State did *not* knowingly present perjured testimony. SA2, 3.[12] He added, in support of that finding, "I believe Mr. McKay's [the prosecutor's] testimony, and I believe he honestly brought forth Wilson's testimony." SA3; *see also* SA2 ("Mr. McKay's testimony was credible and I believe it.").

The postconviction judge's finding on this point necessarily defeats Meyers' *Napue* claim. In the briefing, Meyers has argued the question of the State's knowledge of Wilson's perjury purely as a *de novo* matter, as if the state courts had never reached it. But the state postconviction judge obviously did decide this question, and so our role as a federal court is to consider whether the judge's factual determination was unreasonable given the evidence presented to him. § 2254(d)(2). The AEDPA requires us to presume that the state court's

---

[12] Smith and Bannister pursued *Napue* claims in addition to the actual innocence claims. The postconviction court granted them relief on the actual innocence claims in the form of a new trial.

finding was correct, and it places the burden on Meyers to rebut that presumption with clear and convincing evidence. *See Shannon*, 27 F.4th at 1268. Meyers has not undertaken to make that showing by engaging with the judge's adverse finding and demonstrating, with clear and convincing evidence, why the judge resolved this point unreasonably. Consequently, we must accept the postconviction judge's finding as reasonable; and that finding precludes relief to Meyers under *Napue*.[13]

### III.

For all of the foregoing reasons, we AFFIRM the judgment.

---

[13] We note that much of the evidence Meyers cites as proof that the State must have known that Wilson was lying—including, for example, certain conflicts between Wilson's account at trial and his prior statements to the police and to the grand jury, and the obvious limitations on what Wilson would have been able to see from the second-floor porch of the 3517-19 building (as Detective Winstead acknowledged in his testimony)—was thoroughly explored on cross-examination by defense counsel at trial.