In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-3268

MICHAEL WILLIAMS,

*Petitioner-Appellant,*

*v.*

MICHAEL MEISNER,*

*Respondent-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:21-cv-1066 — **Stephen C. Dries**, *Magistrate Judge.*

ARGUED OCTOBER 21, 2024 — DECIDED JUNE 16, 2025

Before ROVNER, SCUDDER, and LEE, *Circuit Judges.*

---

* We substitute Michael Meisner, the warden of the correctional facility where Williams is currently incarcerated, for Dylan Radtke, the warden where he was incarcerated when he filed his habeas corpus petition. *See* Fed. R. App. P. 43(c)(2).

LEE, *Circuit Judge*. A Wisconsin jury convicted Michael Williams of reckless homicide and possession of a firearm as a convicted felon. He appealed his convictions to the Wisconsin Court of Appeals, contending that one of the jury instructions unconstitutionally lowered the government's burden of proof and that the prosecutor's closing arguments improperly imposed on him the burden of proving his innocence. The Wisconsin appellate court affirmed the convictions, and the Wisconsin Supreme Court denied his petition for review.

Williams then filed a petition for habeas corpus in federal court. The district court held that the state appellate court reasonably applied Supreme Court precedent when concluding it was not reasonably likely that the jury had applied the relevant instruction in an unconstitutional manner. The court also held that Williams had not demonstrated that the prosecutor's remarks violated clearly established Supreme Court precedent. On appeal, Williams raises the same two arguments,[1] and we affirm.

## I

Williams does not challenge the Wisconsin Court of Appeals's statement of facts. In light of this, we adopt those facts as presumptively correct. *See Pierce v. Vanihel*, 93 F.4th 1036, 1045 (7th Cir. 2024); 28 U.S.C. § 2254(e)(1).

The charges in this case arose from the shooting death of Frederick Martin at a gas station in Milwaukee in July 2015. The prosecution's theory at trial was that Williams shot

---

[1] Although Williams's opening brief also contended that the cumulative effect of the errors deprived him of a fair trial, he has withdrawn that argument.

Martin and fled the gas station in a car driven by Tony Madison. Just a short time later, Williams and Madison were themselves shot on a nearby street in retaliation for the Martin shooting (or so the government posited). At trial, the prosecution introduced the following evidence.

Miguel Henderson met Martin at a gas station on Center Street in Milwaukee and got into the front passenger seat of Martin's car. According to Henderson, a man then entered the backseat of Martin's car and shot Martin, who was sitting in the driver's seat. Surveillance footage at the gas station showed a man wearing camouflage pants enter the backseat of Martin's car immediately before Martin was shot. The man then fled in a red truck driven by another man wearing a white, blue, and red sweatshirt.

As the red truck was leaving the gas station, a silver car that had arrived before the shooting began following it. About fifteen minutes later, a second shooting was reported about five miles away on 54th Street. Surveillance footage of the second shooting showed a silver car similar to the one that had followed the red truck out of the gas station.

Police found the red truck on 54th Street abandoned; it had smeared blood stains on the driver's side. They also found a maroon minivan with bullet holes. Both vehicles were located near Tiffany McAffee's residence.

At the trial, McAffee testified that she heard shots fired outside of her house that day. She also stated that Madison had been at her house earlier and had left about an hour before the shooting. Furthermore, McAffee identified the maroon minivan as belonging to Madison. And, when shown a

photograph of Williams, McAffee said that she did not know him but had seen him with Madison in the past.

After the shooting on 54th Street, emergency responders found Madison suffering from a gunshot wound several blocks from the two cars. They transported him to the hospital. Madison was wearing a white, blue, and red sweatshirt that matched the shirt worn by the driver of the red truck that had fled from the gas station after the Martin shooting.

A witness who had been in the vicinity at the time of the shooting testified that he had encountered a man in camouflage pants who had been shot. The prosecutors then introduced evidence that a man wearing camouflage pants appeared at a nearby hospital about an hour later suffering from a gunshot wound. The man was identified as Williams.

In closing arguments, the defense argued that the prosecution had not satisfied its burden of proof to establish that Williams had killed Martin. Counsel asserted that "the truth is that we simply don't know what happened" and that "[w]e don't have concrete evidence that tells us what happened to Fred Martin on that day."

In rebuttal, the prosecution argued that "[t]he thrust of [defense counsel's] remarks, that's a -- kind of a moldy, old ratty defense that we sometimes see when the defense has no good facts." Williams objected and, at sidebar, requested a mistrial on grounds that the prosecution had improperly shifted the burden of proof to the defense. The court denied his request.

After the sidebar, the prosecution continued its rebuttal. The prosecutor stated that the defense counsel's theory had "no answer" for the facts tying Madison to both shooting

scenes, "no answer" for McAffee's testimony that she had seen Williams with Madison in the past, and "no answer" for the fact that Williams had arrived at the hospital with a gunshot wound wearing camouflage pants.

The court gave the jury the following curative instruction in response to Williams's objection to the prosecutor's statements: "Consider carefully the arguments of the attorneys, but … their arguments and opinions are not evidence." Moreover, the court told the jury that "[t]he burden of proof is entirely on the State of Wisconsin. And the defense can just -- do nothing. The elements have to be proved by the state beyond a reasonable doubt." The court also gave the standard jury instruction explaining the prosecution's burden of proof, which included the following: "While it is your duty to give the defendant the benefit of every reasonable doubt, you are not [to] search for doubt. You are to search for the truth."

The jury found Williams guilty of a lesser included offense—first-degree reckless homicide as a party to a crime by use of a dangerous weapon. It also found that Williams was guilty of possessing a firearm despite being a felon.

## II

Section 2254(d) of Title 28, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, empowers federal courts to grant writs of habeas corpus to individuals in custody under state court judgments that (1) are "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) are "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d). We look to "the 'last reasoned state-court decision' to decide the merits of the

case." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc) (quoting *Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013)).

On appeal, Williams relies on the first option: he argues that the Wisconsin appellate court unreasonably applied clearly established Supreme Court precedent when denying his appeal. A "decision involves an unreasonable application of [the Supreme Court's] clearly established precedents if the state court applies [such] precedents to the facts in an objectively unreasonable manner." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

Notably, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). "It is not enough that a state court simply may have applied the law erroneously or incorrectly." *Alston v. Smith*, 840 F.3d 363, 369 (7th Cir. 2016). Rather, the application must lie "well outside the boundaries of permissible differences of opinion." *Id.* (internal quotation marks omitted). In other words, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

"If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. Federal habeas relief "is reserved for those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims." *Dassey*, 877 F.3d at 302.

**A**

Williams first argues that the Wisconsin Court of Appeals unreasonably applied Supreme Court precedent when it concluded that it was not reasonably likely that the jury had applied the reasonable doubt instruction in a manner that violated due process. In his view, the instruction permitted the jury to convict him without requiring the state to prove his guilt beyond a reasonable doubt.

Where a criminal defendant challenges a jury instruction as violative of due process, a court must determine "whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Victor v. Nebraska*, 511 U.S. 1, 6 (1994). In *Winship*, the Supreme Court held that due process requires the government to prove beyond a reasonable doubt every element of the charged offense. 397 U.S. 358, 364 (1970).

Williams asserts that the state appellate court unreasonably applied three Supreme Court cases that involved jury instructions defining reasonable doubt—*Cage v. Louisiana*, 498 U.S. 39 (1990) (per curiam), *Sullivan v. Louisiana*, 508 U.S. 275 (1993), and *Victor*, 511 U.S. 1.

In *Cage*, the jury instruction at issue defined reasonable doubt as "an actual substantial doubt" that "would give rise to a grave uncertainty." 498 U.S. at 40. It ended by stating, "What is required is not an absolute or mathematical certainty, but a moral certainty." *Id.* The Supreme Court concluded that the terms "substantial" and "grave" "suggest[ed] a higher degree of doubt than is required for acquittal under the reasonable-doubt standard" and that the term "moral certainty" was untethered to "evidentiary certainty." *Id.* at 41. As

a result, the Court held that "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Id.*

Three years later, in *Sullivan*, the Supreme Court determined that a reasonable doubt instruction "essentially identical" to the one in *Cage* constituted a "structural defect[] in the constitution of the trial mechanism" to which harmless-error analysis did not apply. 508 U.S. at 277, 281–82.

Lastly, in *Victor*, the Supreme Court distinguished the following jury instruction from that in *Cage*: "A reasonable doubt is an actual and substantial doubt reasonably arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the State, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture." 511 U.S. at 18. The Supreme Court explained that, although the challenged instruction referred to "substantial doubt" like the instruction in *Cage*, it made an "explicit distinction between a substantial doubt and a fanciful conjecture" that rendered its use of "substantial" constitutionally sufficient. *Id.* at 20. Furthermore, the Court observed that the trial court had provided an alternative definition of reasonable doubt—"a doubt that would cause a reasonable person to hesitate to act"—that the Court had approved in the past. *Id.*

In contrast with *Cage*, *Sullivan*, and *Victor*, the reasonable doubt instruction in this case does not use terms like "substantial" or "grave" to describe the meaning of "reasonable doubt." Rather, the instruction states:

> The term *reasonable doubt* means a doubt based upon reason and common sense. It's a doubt for which a reason can be given arising from a fair and rational consideration of the evidence or lack of evidence.
>
> It means such a doubt as would cause a person of ordinary prudence to pause or hesitate when called upon to act in the most important affairs of life.
>
> A reasonable doubt is not a doubt which is based upon mere guesswork or speculation. A doubt which arises merely from sympathy or from fear to return a verdict of guilt is not a reasonable doubt.
>
> A reasonable doubt is not a doubt such as may be used to escape the responsibility of making a decision.
>
> While it is your duty to give the defendant the benefit of every reasonable doubt, you are not [to] search for doubt. You are to search for the truth.

Williams takes particular issue with the last paragraph. In his view, it unconstitutionally forbade the jury from looking for any doubt at all, reasonable or otherwise. But as *Victor* teaches, rather than viewing a particular term or phrase in an instruction in isolation, we must read it in context with the other instructions. 511 U.S. at 22–23.

When we do so, the meaning of the final paragraph becomes apparent. For example, the trial court later gave the jury the following instruction:

> Let the verdicts speak the truth, whatever the truth might be. Justice through trial by jury depends upon the willingness of each of you to seek the truth as to the facts and the same evidence presented to all of you and

> to arrive at a verdict applying the rules of law as given
> in the instructions of the Court.

Thus, read together, the instructions correctly apprised the jury that its role was to try to discern the true facts and arrive at a verdict that is consistent with the evidence and the court's instructions of law.

Furthermore, contrary to Williams's contention, the trial judge did not prohibit the jury from entertaining the existence of doubt. In fact, the court told the jury repeatedly in one form or another that the state had the burden to prove its case "beyond a reasonable doubt." Indeed, immediately prior to explaining what it meant by "reasonable doubt," the court reminded the jury once again that "[t]he burden of establishing every fact necessary to constitute guilt is upon the state. Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty." What is more, the court's instruction that reasonable doubt "means such a doubt as would cause a person of ordinary prudence to pause or hesitate" is "a formulation [the Supreme Court has] repeatedly approved." *See Victor*, 511 U.S. at 20.

It is true that various circuits, including our own, have warned that attempting to define reasonable doubt in jury instructions is a task fraught with peril. *See United States v. Hall*, 854 F.2d 1036, 1039 (7th Cir. 1988); *see also Monk v. Zelez*, 901 F.2d 885, 889–90 (10th Cir. 1990); *United States v. Moss*, 756 F.2d 329, 333 (4th Cir. 1985); *United States v. Indorato*, 628 F.2d 711, 720–21 (1st Cir. 1980); *United States v. Byrd*, 352 F.2d 570, 575 (2nd Cir. 1965). Nonetheless, as the Supreme Court has recognized, "the Constitution neither prohibits trial courts

from defining reasonable doubt nor requires them to do so as a matter of course." *Victor*, 511 U.S. at 5.

To buttress his position, Williams also points to an empirical study indicating that mock jurors, who are told "not to search for doubt" but instead "to search for the truth," were nearly twice as likely to believe they could convict a defendant even if they had a reasonable doubt of guilt. *See* Michael D. Cicchini & Lawrence T. White, *Testing The Impact of Criminal Jury Instructions on Verdicts: A Conceptual Replication*, 117 Colum. L. Rev. 22, 23 (2017). But it is unclear whether the subjects of that study were given the additional instructions that the trial court gave here; and, as we have explained, such context matters, *see Victor*, 511 U.S. at 22–23.

For these reasons, Williams has not shown that the Wisconsin Court of Appeals unreasonably applied clearly established Supreme Court precedent.

**B**

Next, Williams contends that the state appellate court unreasonably applied federal law when concluding that the prosecutor's closing remarks did not shift the burden of proof to the defense. In particular, Williams points to the prosecutor's rebuttal argument that defense counsel's theory had "no answer" for the evidence tying Madison to both shootings, "no answer" for McAffee's testimony linking Williams with Madison, and "no answer" for the fact that Williams checked into a nearby hospital with a gunshot wound wearing camouflage pants.

To prevail on this argument, however, Williams faces an uphill climb. As the Supreme Court has instructed, "a criminal conviction is not to be lightly overturned on the basis of a

prosecutor's comments standing alone, for the statements or conduct must be viewed in context[.]" *United States v. Young*, 470 U.S. 1, 11 (1985). Moreover, it is "not enough that the prosecutors' remarks were undesirable or even universally condemned," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). Rather, the correct inquiry is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Here, Williams relies on *United States v. Smith*, 500 F.2d 293 (6th Cir. 1974). In that case, the prosecution introduced in evidence several recorded telephone calls that, it believed, implicated the defendants. *Id.* at 294. And, at closing, it took the defendants to task for not providing any alternative explanations for the conversations, stating to the jury, "If they have some reasonable alternatives to suggest as to what the calls mean, then I leave with you now, you then require them to show that to you." *Id.* at 295. After reviewing the prosecution's closing argument and the curative instruction provided by the trial court, the Sixth Circuit concluded that the statements prejudiced defendants' right to a fair trial. *Id.* at 298. *Smith*, however, does not help Williams for several reasons.

First, *Smith* is a Sixth Circuit case and does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States," as § 2254(d) requires. Moreover, because *Smith* involved a direct appeal, the Sixth Circuit based its holding on its supervisory power over criminal trials and expressly declined to decide whether the prosecutor's remarks were unconstitutional. *See* 500 F.2d at 296 (stating that "[o]ur decision here is based on our supervisory powers and not on the Constitution"). By contrast, "the

appropriate standard of review for … a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642).

Williams also directs us to two Supreme Court cases cited in *Smith* (albeit in *dicta*). *See* 500 F.2d at 296–97. First is *Griffin v. California*, 380 U.S. 609 (1965). In *Griffin*, the prosecutor highlighted during closing argument various facts that incriminated the defendant and stated, "These things [the defendant] has not seen fit to take the stand to deny or explain." *Id.* at 611. The trial court then instructed the jury that it could weigh the defendant's silence against him. *Id.* at 610–11.

The facts here are markedly different. As Williams concedes, the state did not comment on Williams's failure to testify, nor did the trial court instruct the jury to consider it. In fact, the trial court did the opposite, explaining to the jury that "[d]efendants are not required to prove their innocence"; "[t]he law presumes every person charged with the commission of an offense to be innocent"; and "[t]he burden of establishing every fact necessary to constitute guilt is upon the state." Given this, the jury would not have "naturally and necessarily" viewed the prosecutor's remarks as commenting on Williams's failure to testify, distinguishing this case from *Griffin*. *United States ex rel. Burke v. Greer*, 756 F.2d 1295, 1300 (7th Cir. 1985) (quoting *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir. 1968)).

Williams also relies on another case cited in *Smith*, *Kotteakos v. United States*, 328 U.S. 750 (1945). There, the Supreme Court held that improper prosecutorial comments are harmless on habeas review unless they "had [a] substantial and injurious effect or influence in determining the jury's verdict."

*Id.* at 776; *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). According to Williams, in this case, the prosecutor's comments crossed the line.

When assessing the impact of prosecutorial comments on the jury, the Supreme Court instructs courts to consider them "in light of the record as a whole." *Brecht*, 507 U.S. at 638. Here, the Wisconsin Court of Appeals, citing *State v. Patterson*, 790 N.W.2d 909, 925 (Wis. 2010), faithfully applied that standard to the record before it.

Key to the Wisconsin appellate court's analysis were the trial court's curative instructions given on the heels of the prosecution's rebuttal argument. The trial judge explained that the attorneys' arguments were not evidence. And he reiterated that "[t]he burden of proof is entirely on the State of Wisconsin. And the defense can just -- do nothing. The elements have to be proved by the state beyond a reasonable doubt." In the eyes of the appellate court, these instructions cured any potential misunderstanding regarding the prosecution's burden of proof and eliminated the possibility of undue prejudice. We believe this was a reasonable application of controlling Supreme Court precedent.

Of course, reasonable jurists might disagree as to whether the trial court's curative instructions were enough. But, as a habeas petitioner, Williams must show that "the state court's ruling … was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Harrington*, 562 U.S. at 103. He has not done so here.

**III**

For the foregoing reasons, the judgment is AFFIRMED.